# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 5, 2018        Decided July 20, 2018

No. 17-5123

ASSOCIATION OF AMERICAN RAILROADS,
APPELLEE

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01499)

*Patrick G. Nemeroff*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Chad A. Readler*, Acting Assistant Attorney General, *Jessie K. Liu*, U.S. Attorney, *Mark B. Stern*, *Michael S. Raab*, and *Daniel Tenny*, Attorneys, *Steven G. Bradbury*, General Counsel, U.S. Department of Transportation, *James Owens,* then-Acting General Counsel, *Paul M. Geier*, Assistant General Counsel, *Christopher S. Perry*, Acting Deputy Assistant General Counsel for Litigation and Enforcement, *Joy K. Park*, Senior Trial Attorney, *Juan D. Reyes III*, Chief Counsel, Federal Railroad Administration, and *Zeb G. Schorr*, Assistant Chief Counsel.

*Thomas H. Dupree Jr.* argued the cause for appellee. With him on the brief were *David A. Schnitzer*, *Kathryn Kirmayer*, and *Daniel Saphire*.

Before: GARLAND, *Chief Judge*, and TATEL and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* TATEL.

MILLETT, *Circuit Judge*: A dispute between passenger and freight trains over priority access to railroad tracks has turned into a legal donnybrook over the bounds of congressional power. This court previously held that Congress went off the constitutional rails by empowering Amtrak to establish metrics and standards affecting track usage over the opposition of the private freight railroads that own those tracks and without the intermediation and control of a neutral governmental decisionmaker. More specifically, this court ruled that the Due Process Clause does not allow Amtrak to use an arbitration process to impose its preferred metrics and standards on its competitors, notwithstanding their opposition and that of the Federal Railroad Administration.

The question in this case is how to remedy that constitutional problem. We hold that severing the arbitration provision is the proper remedy. Without an arbitrator's stamp of approval, Amtrak cannot unilaterally impose its metrics and standards on objecting freight railroads. No rule will go into effect without the approval and permission of a neutral federal agency. That brings the process of formulating metrics and standards back into the constitutional fold.

3

**I**

**A**

The Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat. 1327, established Amtrak (a/k/a the National Passenger Railroad Corporation) to "reinvigorate a national passenger rail system that had * * * grown moribund and unprofitable," *Association of American R.R. v. Department of Transp.*, 721 F.3d 666, 668 (D.C. Cir. 2013) (*American Railroads I*), and "to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements," Rail Passenger Service Act § 301, 84 Stat. at 1330.   In passing that legislation, "Congress recognized that Amtrak, of necessity, must rely for most of its operations on track systems owned by the [regional] freight railroads."  *Department of Transp. v. Association of American R.R. (American Railroads II)*, 135 S. Ct. 1225, 1229 (2015).

Three years later, Congress granted Amtrak's passenger rail service "preference over freight transportation in using a rail line[.]"   49 U.S.C. § 24308(c).   To implement that priority system, Congress authorized Amtrak to enter into agreements with rail carriers and regional transportation authorities "to use [the] facilities of, and have services provided by, the carrier or authority under terms on which the parties agree."   *Id*. § 24308(a).   Congress added that the "terms shall include a penalty for untimely performance" by either party.   *Id*.   If Amtrak and the carrier or authority could not agree on governing terms, Congress empowered the federal Surface Transportation Board to "order that the facilities be made available and the services provided to Amtrak," and to

"prescribe reasonable terms and compensation for using the facilities and providing the services." *Id.*[1]

In 2008, Congress enacted the Passenger Rail Investment and Improvement Act ("2008 Rail Act"), Pub. L. No. 110-432, 122 Stat. 4848, *codified* at 49 U.S.C. § 24101 note. That statute reconfigured the process for Amtrak to coordinate its rail access with private freight railroads. As is most relevant here, the Act directed that Amtrak and the Department of Transportation's Federal Railroad Administration "shall jointly * * * develop new or [shall] improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations, including cost recovery, on-time performance and minutes of delay, ridership, on-board services, stations, facilities, equipment, and other services." *Id.* § 207(a). As part of that process, the 2008 Rail Act requires Amtrak and the Administration to "consult[] with" the Surface Transportation Board, rail carriers over whose rail lines Amtrak trains operate, States, passenger representatives, and Amtrak employees about the appropriate metrics and standards. *Id.*

If Amtrak and the Administration are unable to develop those metrics and standards within 180 days, Congress authorized "any party involved in the development of those standards" to "petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." 2008 Rail Act § 207(d), 49 U.S.C. § 24101 note.

---

[1] Originally, the 1973 Act charged the Interstate Commerce Commission with resolving any disagreement. 45 U.S.C. §§ 561, 562 (1970 ed.). That authority was transferred to the Surface Transportation Board in 1996. *American Railroads II*, 135 S. Ct. at 1229; ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

5

**B**

**1**

In tracing the history of this litigation, we write on a full slate. In March 2009, Amtrak and the Federal Railroad Administration published a Federal Register notice inviting comments on proposed metrics and standards pertaining to Amtrak's invocation of its right under the 2008 Rail Act to priority access to the railways. The Association of American Railroads ("Railroad Association") is a group of large freight railroad owners that operate tracks that Amtrak uses. The Railroad Association and its members submitted numerous comments, mostly concerning the increased expense associated with expanding and maintaining the needed track capacity and the timing metrics. *See, e.g.,* J.A. 165, 171, 176.

The final metrics and standards that issued in May 2010 did not alleviate the Railroad Association's concerns. So the Railroad Association filed suit in federal district court challenging the facial constitutionality of Section 207's scheme for promulgating metrics and standards. The Railroad Association argued that the provision unconstitutionally delegated regulatory power over private entities to Amtrak, an allegedly non-governmental entity, by allowing it to influence or control the content of the metrics and standards imposed on its competitors. American Railroads Mot. for Summ. J., *Association of American R.R. v. Department of Transp.*, Civ. No. 11-1499 (D.D.C. May 31, 2012), ECF No. 8 at 7. The district court found no constitutional problem and granted summary judgment for the government. *Association of American R.R. v. Department of Transp.*, Civ. No. 11-1499 (D.D.C. May 31, 2012), ECF No. 17 at 2.

On appeal, this court deemed Amtrak to be a private entity and ruled that Section 207 unconstitutionally delegated authority to a private party "to jointly develop performance measures to enhance enforcement of the statutory priority Amtrak's passenger rail service has over other [private freight] trains." *American Railroads I*, 721 F.3d at 668.

The Supreme Court vacated that constitutional ruling. *American Railroads II*, 135 S. Ct. at 1234. The Court emphasized that "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Id.* at 1232. Consequently, when undertaking "its joint issuance of the metrics and standards with the [Federal Railroad Administration], Amtrak acted as a governmental entity for the purposes of the Constitution's separation of powers provisions." *Id*. at 1232–1233. The Supreme Court then remanded the case for this court to address whether Section 207 ran afoul of the Fifth Amendment's Due Process Clause by giving Amtrak, a "for-profit corporation[,] regulatory authority over its own industry," and whether the arbitration provision violated the Appointments Clause, U.S. CONST., ART. II, § 2, CL. 2. *American Railroads II*, 135 S. Ct. at 1234.

**2**

On remand, this court again held Section 207 unconstitutional. *Association of American R.R. v. Department of Transp. (American Railroads III)*, 821 F.3d 19 (D.C. Cir. 2016). We held that Section 207 unconstitutionally delegated to Amtrak, a "self-interested entity," *id*. at 31, the authority to "regulate its resource competitors," *id*. at 23, in violation of the Due Process Clause.

This court rejected the government's argument that the Federal Railroad Administration's joint role in promulgating the metrics and standards tempered any due process concerns. We explained that the Administration "is powerless to overrule Amtrak" because, if there is "intractable disagreement between the two, the matter is resolved by an arbitrator, who may ultimately choose to side with Amtrak" in binding arbitration. *American Railroads III*, 821 F.3d at 35. Because the arbitration provision prevents the Administration from "keep[ing] Amtrak's naked self-interest in check," we concluded, "the requirement of joint development does not somehow sanitize the Act." *Id*.; *see id*. at 34. n.4 (distinguishing Supreme Court precedent upholding joint regulatory efforts by "a self-interested group and a government agency" because the Administration's "authority to hold the line against overreaching by Amtrak is undermined by the power of the arbitrator" to independently authorize Amtrak's metrics and standards).

Lastly, this court held that appointment of the arbitrator violated the Constitution's Appointments Clause. This court concluded that the arbitrator's binding decision constituted final agency action. Yet the arbitrator was not appointed by the President, but rather by an independent agency, the Surface Transportation Board, which also had no oversight or review of the arbitrator's decision. *American Railroads III*, 821 F.3d at 38–39.

**3**

The case then returned to district court to remedy the constitutional violations. With the agreement of both the Railroad Association and the government, the district court vacated the May 2010 metrics and standards. *Association of American R.R. v. Department of Transp.*, Civ. No. 11-1499

(D.D.C. Mar. 23, 2017), ECF No. 27 at 6. The district court then declared Section 207's entire Amtrak-influenced process for formulating metrics and standards unconstitutional, rejecting the government's argument that severing Section 207(d)'s arbitration provision by itself would cure the identified constitutional infirmities. *Id.* at 5.

## II

The district court had jurisdiction over this case under 28 U.S.C. § 1331, and we have jurisdiction to review its final order under 28 U.S.C. § 1291. We review *de novo* questions concerning the remediation of a statute's unconstitutionality and questions of statutory construction. *See Stop This Insanity Inc. Employee Leadership Fund v. FEC*, 761 F.3d 10, 13 (D.C. Cir. 2014).

## A

### 1

Now at round four of this appellate litigation, we reach the question of how to remediate the constitutional violations previously found. The government does not challenge the prior panel's constitutional holdings on this appeal and, in any event, we are bound by them. The district court vacated the most immediate byproduct of the constitutional violations—the metrics and standards adopted in May 2010—and that aspect of the district court's decision is final and is also not challenged on appeal. The question instead is how to constitutionally right the statutory ship going forward. Because the linchpin for Amtrak's ability to unconstitutionally exercise regulatory authority over its competitors was the 2008 Rail Act's binding arbitration provision, severing Section

207(d) will fully cure the constitutional violations found in *American Railroads III*.

Declaring unconstitutional an Act of Congress, duly adopted by the Legislative Branch and signed into law by the Executive, is one of the gravest powers courts exercise. Longstanding principles of constitutional avoidance caution courts against exercising that power unless it is strictly necessary to resolve a case. *See, e.g.*, *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989). And even when a constitutional question must be joined, courts must choose the narrowest constitutional path to decision. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995).

When a statute has been held to be unconstitutional, an important corollary to those principles of constitutional avoidance is that the remedy should be no more severe than necessary to cure the disease. When possible, courts must preserve as much of a statute as is constitutionally possible, because "[t]he cardinal principle of statutory construction is to save and not to destroy." *Tilton v. Richardson*, 403 U.S. 672, 684 (1971) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937)).

Our decision in *American Railroads III* points us down that same narrow path. In concluding that the 2008 Rail Act's process for developing metrics and standards was unconstitutional, this court's analysis comprised two distinct determinations: (1) that Amtrak was economically self-interested in and competing with the freight railroads as to the content of the metrics and standards, and (2) the 2008 Rail Act endowed Amtrak with the power to regulate those competitors. *American Railroads III*, 821 F.3d at 31. Both prongs were

required to make out a Due Process Clause violation. *Id*. at 31.

This court's resolution of that second prong identifies the arbitration provision as the critical constitutional fissure. After all, the constitutional problem in this case was not that Amtrak exercised *some* role in formulating those metrics and standards—Amtrak had some role under the 1970 Act and the 1973 amendment, which the freight railroads have not challenged. Plus Amtrak's participation to some extent is inherent in the development of contracts between Amtrak and individual freight railroads that embody those metrics and standards. *See* 49 U.S.C. § 24308(a).

Nor, as our prior opinion explained, would the Constitution prohibit Amtrak from exercising some measure of joint control with a disinterested governmental agency, as long as that agency's duty to protect the "public good" could check Amtrak's self-interest and prevent unfair harm to its competitors. *American Railroads III*, 821 F.3d at 29. Indeed, our prior opinion specifically noted that a number of arrangements by which regulatory measures were imposed through the "joint action of a self-interested group and a government agency" had passed constitutional muster. *Id*. at 34 n.4 (citing *Currin v. Wallace*, 306 U.S. 1 (1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940)).

Instead, the straw that broke the camel's back was that the 2008 Rail Act stripped the Federal Railroad Administration of that independent ability to temper or prevent Amtrak from adopting measures that promoted its own self-interest at the expense of its freight railroad competitors. It was Section 207(d)'s binding-arbitration provision that both gave Amtrak that independent regulatory muscle and disarmed the Administration. The 2008 Rail Act charged Amtrak and the

Administration, at the outset, with developing the metrics and standards jointly.  2008 Rail Act § 207(a), 49 U.S.C. § 24101 note.  But critically, if that collaborative process stalled, Section 207(d) allowed Amtrak on its own to request the appointment of a Surface Transportation Board arbitrator. 2008 Rail Act § 207(d), 49 U.S.C. § 24101 note.  The arbitrator then had the authority, through binding arbitration, to force the promulgation of final metrics and standards regardless of the Administration's, the private freight railroads', or anyone else's objections to their terms. *American Railroads III*, 821 F.3d at 39.

So the arbitration provision is what constitutionally derailed the statutory scheme.  For it empowered Amtrak to impose on its competitors rules formulated with its own self-interest in mind, without the controlling intermediation of a neutral federal agency.  All Amtrak had to do was persuade the arbitrator to rule in its favor.  Once that happened, the disinterested governmental agency—the Administration— "[wa]s powerless to overrule Amtrak." *American Railroads III*, 821 F.3d at 35.  Whatever "equal authority" the Administration initially had with Amtrak by virtue of the charge to jointly develop the metrics and standards, that power would evaporate "[w]hen there is intractable disagreement between the two[.]" *Id*.  At that point, "the matter is resolved by an arbitrator, who may ultimately choose to side with Amtrak." *Id*.  The Administration "cannot keep Amtrak's naked self-interest in check, and therefore the requirement of joint development does not somehow sanitize the [2008 Rail] Act." *Id*.

Emphasizing the centrality of the arbitration provision to our constitutional decision, this court pointed to Amtrak's arbitration escape hatch to distinguish Supreme Court precedent otherwise upholding programs for the joint private

and governmental promulgation of regulations. For example, in *Currin v. Wallace*, the Tobacco Inspection Act of 1935, 7 U.S.C. §§ 511 *et seq.*, delegated to the Secretary of Agriculture the authority to set standards for various classes of tobacco that would affect the commodity's market pricing. 306 U.S. at 5–6. But the Secretary's proposed standards and prices would govern only if two-thirds of the tobacco growers within the market region approved them by referendum. *Id.* at 15. The Supreme Court upheld that provision because the Secretary's ultimate control over the content of the standards and prices submitted for approval meant that self-interested producers had neither the power to craft the rules in their own image nor to "force [them] upon a minority" of competitors. *Id.*; *see United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 577–578 (1939) (upholding marketing orders for milk because, even though they were approved by two-thirds of milk producers, the Secretary of Agriculture exercised ultimate control over the prices set).

Similarly, in *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), the Supreme Court upheld a provision in the 1937 Bituminous Coal Act, 15 U.S.C. §§ 828 *et seq.*, under which participating coal producers could propose minimum coal prices to a government agency—the National Bituminous Coal Commission. The Coal Commission, however, retained complete authority to "approve[], disapprove[], or modif[y]" the prices ultimately adopted. *Id*. at 388; *see id*. at 399. Because the Commission exercised "authority and surveillance" over the participating coal producers, and because law-making remained in the hands of the agency and was "not entrusted to the industry," the Supreme Court declared the statutory scheme to be "unquestionably valid." *Id*. at 399.

The arbitration provision in the 2008 Rail Act broke from that mold. Ultimate control over the regulatory standards did not rest with a neutral governmental agency; it could be exercised by Amtrak with an assist from the arbitrator. *American Railroads III*, 821 F.3d at 34 n.4. "[T]he [Federal Railroad Administration's] authority to hold the line against overreaching by Amtrak," we explained, "is undermined by the power of the arbitrator." *Id.*

Said another way, without the ability to resort to binding arbitration, Amtrak would have no power to impose its own self-interested regulatory measures on its competitors. While Amtrak could press its views with the Federal Railroad Administration, unless the Administration independently determined that those standards were in the public interest—not just Amtrak's interests—Amtrak's proposals would hit a dead-end. *See American Railroads I*, 721 F.3d at 674 (stating that, if the regulatory authority to set metrics and standards is wielded by a governmental agency, "[Section] 207 is of no constitutional moment").

**2**

Our dissenting colleague reads our prior decision differently, concluding that *American Railroads III* constitutionally quarantined Amtrak away from any "participation" in the regulatory process "*at all*," Dissent Op. at 1, 7, and forbade even efforts to "convinc[e]" or "persuade" the Federal Railroad Administration what the metrics and standards governing its own performance should be, *id*. at 7, 13.

But our prior opinion never said that the Constitution required sidelining Amtrak throughout the regulatory process. We were quite explicit about what the constitutional Due

Process problem was: Notwithstanding its self-interest, the 2008 Rail Act empowered Amtrak "to regulate" its competitors and "to make law." 821 F.3d at 23; *see id*. at 27 ("Our view of the case can be reduced to a neat syllogism," which turns at each line of the syllogism on whether the Act gives Amtrak "regulatory authority"); *id*. (due process question turns on whether Amtrak has "rulemaking authority"); *see also American Railroads II*, 135 S. Ct. at 1234 (remanding for decision as to whether Amtrak unconstitutionally exercised "regulatory authority" over its competitors).

So the critical constitutional question is what in the 2008 Rail Act made Amtrak itself a *regulator*—that is, what allowed it to make law. It was not, we said, Amtrak's ability to engage in "joint [regulatory] action" with the Administration. Such joint efforts between "a self-interested group and a government agency," we specifically noted, raised no constitutional eyebrow as long as the government agency could "hold the line" against the entity's "overreaching" to advance its own self-interests. 821 F.3d at 34 n.4. The opinion then went on to explain that the critical check on private interests that had been present in those Supreme Court cases was missing here precisely because the "[Administration] is powerless to overrule Amtrak," and when there is "intractable disagreement between the two, the matter is resolved by an arbitrator, who may ultimately side with Amtrak." *Id*. at 35. As a result, the Administration "cannot keep Amtrak's naked self-interest in check." *Id*.

The dissenting opinion rightly notes our holding that the metrics and standards the Administration and Amtrak jointly develop are forms of regulation, 821 F.3d at 33-34, and reads our opinion as holding that the constitutional flaw was in vesting "'Amtrak [with] the authority to develop [those] metrics and standards—constrained very partially . . . by the

[Administration] and the arbitrator[.]'" Dissent Op. at 8 (quoting 821 F.3d at 33). To the dissenting opinion, the ensuing discussion about joint rulemaking efforts and the Administration's and arbitrator's inability to rein Amtrak in was simply an explanatory aside just answering the government's argument about precedent. Dissent Op. at 11-12.

Our opinion said otherwise, explicitly wrapping the two points together. The source of the constitutional trouble, we explained, was that the 2008 Rail Act vested "Amtrak [with] the authority to develop [those] metrics and standards—constrained very partially, **as discussed below**, by the [Administration] and the arbitrator[.]" *Id*. at 33 (bold added). The referenced "discuss[ion] below" was precisely the analysis on the following pages of how the arbitration option allowed Amtrak to escape the type of check on its self-interest that the Due Process Clause requires when regulations are jointly developed between a government agency and self-interested groups. The two portions of the opinion cannot be delinked.

The crux of the constitutional problem, in short, was not that Amtrak had input or the opportunity to "persuade" the Administration. Dissent Op. at 13. That happens all the time in the regulatory process by all manner of self-interested parties. "[P]articipation" is not regulation. *Id*. at 1. What went wrong in the 2008 Rail Act was that Amtrak, through unilateral resort to the arbitrator, had the power "to make law," 821 F.3d at 23, by formulating regulatory metrics and standards without the agreement or control of the Administration.[2]

---

[2] The dissenting opinion objects that the arbitration provision had not even been invoked with respect to the May 2010 metrics and standards that the freight railroads challenged. Dissent Op. at 9.

The dissenting opinion also objects that the Federal Railroad Administration itself is neither "disinterested" nor tasked with promoting the freight operators' interests. Dissent Op. at 13. Our prior decision never suggested that the Administration does not act in good faith to protect the public interest, just like the other agencies involved in joint regulatory development with private interests. To the contrary, it explicitly noted that if Congress had "directed the [Federal Railroad Administration] to develop [the metrics and standards] alone," Congress would have been giving regulatory power to a "presumptively disinterested" government entity. *American Railroads III*, 821 F.3d at 35 (quoting *Carter Coal*, 298 U.S. at 311). Anyhow, the relevant constitutional question, as our prior opinion explained, is whether the Administration can "check" Amtrak's self-interests, 821 F.3d at 35, not whether it can speak for a different self-interested group. With the arbitrator provision removed, the Administration can stop a self-serving Amtrak proposal dead in its tracks.

Finally, the dissenting opinion notes that the Administration is housed "in the same branch" of an Executive agency as Amtrak. Dissent Op. at 13. But that is just a reminder that, when it comes to formulating these metrics and standards, the Supreme Court has held that "Amtrak act[s] as a governmental entity," 135 S Ct. at 1233, and thus is not *purely* animated by self-interest. That Amtrak has "public objectives" to serve, *id.* at 1232, is yet another reason that the

---

That is beside the point because the Railroad Association leveled a facial challenge to the 2008 Rail Act provisions. J.A. 20–21. That facial challenge is why we also decided the Railroad Association's Appointments Clause challenge to the same never-appointed arbitrator.

constitutional remedy does not require completely walling Amtrak off from any role at all in the regulatory process.

\* \* \* \* \*

Given all of that, eliminating the arbitration provision is the key to curing the constitutional problem because it eliminates Amtrak's ability and power to exercise regulatory authority over its competitors. Without the Administration's approval, Amtrak's regulatory proposals would amount to nothing more than trying to clap with one hand. Such an ineffective endeavor would not offend the Due Process Clause.

**B**

As a matter of constitutional law, excising Section 207(d)'s binding-arbitration provision would deprive Amtrak of its unlawful ability to engage in regulatory self-help. But a court may order such curative severance only if, as a matter of statutory construction, doing so would leave a functioning statutory scheme and would comport with congressional objectives. *See United States v. Booker¸* 543 U.S. 220, 258–259 (quotations omitted); *see also Bismullah v. Gates*, 551 F.3d 1068, 1071 (D.C. Cir. 2009) ("[W]e must retain those portions of the Act that are (1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress' basic objectives in enacting the statute.") (quotations omitted).

We hold that severing Section 207(d) is the proper medicine in this case, for four reasons.

*First*, there is a presumption in favor of severability. *See*, *e.g.*, *United States v. National Treasury Employees Union*, 513 U.S. 454, 488 (1995); *Bismullah*, 551 F.3d at 1071; *Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1560 (D.C. Cir.

1985). The "normal rule is that partial, rather than facial, invalidation is the required course." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks omitted).

That presumption enforces judicial restraint in constitutional adjudication by ensuring that, to the extent possible, courts "limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund*, 561 U.S. at 508 (internal quotation marks omitted). After all, "the unconstitutionality of a part of an Act" says nothing about "the validity of its remaining provisions[.]" *Id*. (internal quotation marks omitted).

To be sure, this question of statutory (re)construction would be easier if the 2008 Rail Act contained a severability clause. But it does not. Still, sometimes such congressional "silence is just that—silence[.]" *New York v. United States*, 505 U.S. 144, 186 (1992) (internal quotation marks omitted). The absence of a severability clause cuts neither against nor in favor of severance; the presumption of severability remains intact. *Id*.; *see City of New Haven v. United States*, 809 F.2d 900, 905 n.15 (D.C. Cir. 1987).

*Second*, as to the requirement that the statute be functional in the absence of the severed provision, the parallels between the trimmed down 2008 Rail Act and the original 1970 and 1973 schemes offer substantial assurance that the statutory scheme could function even with Section 207(d) pruned away. To be sure, negotiations over what metrics and standards to adopt may be harder without the binding-arbitration tiebreaker. But the Federal Railroad Administration and Amtrak have been working together on such matters for almost half a century, and most of that time without the possibility of resort to binding arbitration. We also assume that the Federal Railroad

Administration and Amtrak, which wears a governmental hat in this role, *American Railroads II*, 135 S. Ct. at 1233, will endeavor to promulgate the required rules in good faith and consistently with their legislatively assigned duties, *see CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 989 (D.C. Cir. 2008) (agencies are presumed to exercise their duties in good faith).

*Third*, narrowly severing Section 207(d) would better comport with Congress's objectives than would throwing the entire Section 207 baby out with the bath water. In this regard, we do not inquire what Congress intended, since it undoubtedly intended the legislation as enacted. "The relevant question * * * is not whether the legislature would prefer (A+B) to B, because by reason of the invalidation of A that choice is no longer available." *Leavitt v. Jane L.*, 518 U.S. 137, 143 (1996). Instead, we ask the more practical question of "whether the legislature would prefer not to have B if it could not have A as well." *Id.*

Severing Section 207(d) leaves intact Congress's objective of streamlining the process for formulating metrics and standards, and even strengthens the statutory command that the Federal Railroad Administration and Amtrak work "jointly" to develop those standards, 2008 Rail Act § 207(a), 49 U.S.C. § 24101 note, by eliminating Amtrak's unilateral ability to break away from that collaborative process. And by preserving the duty to consult with other interested parties, including the freight railroads, severance of the arbitration provision would continue the process of obtaining broad input on the standards.

In addition, nothing in the statutory text, structure, or legislative history indicates that Section 207 was meant to be an all-or-nothing provision or, more to the point, that the binding-arbitration provision was a legislative deal-breaker.

*Cf. Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985) (holding that severance is impermissible where there is evidence that the legislature "would not have passed it had it known the challenged provision was invalid").

*Fourth*, the Railroad Association argues that the government waived its ability to argue for severance by waiting until we remanded to the district court to first propose severance of Section 207(d). That argument fails. To begin with, the question of severance arises only after a statute has been held unconstitutional. It is thus unsurprising that the government devoted its efforts to vigorously defending the constitutionality of the 2008 Rail Act, and did not broach the severability question until the remedial stage of this litigation. The cases on which the Railroad Association relies fall wide of the mark since they involve instances in which the question of severability was not raised at all in the appellate briefing.[3]

In any event, severability is a doctrine borne out of constitutional-avoidance principles, respect for the separation of powers, and judicial circumspection when confronting legislation duly enacted by the co-equal branches of government. Parties cannot, by litigation tactics or oversight,

---

[3] Even assuming that we would agree with these out-of-circuit decisions, they arose in a very different procedural posture. *See, e.g., Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 118 (2d Cir. 2017) (parties expressly sought invalidation of an entire ordinance, not severance); *Telecommunications Regulatory Bd. of Puerto Rico v. CTIA-Wireless Ass'n*, 752 F.3d 60, 63 n.2 (1st Cir. 2014) (noting that the parties only asked for invalidation of an Act "in toto" and maintained that argument on appeal); *Lozano v. City of Hazleton*, 620 F.3d 170, 182 (3d Cir. 2010) (finding a severability argument waived only because no party contested the district court's failure to sever), *vacated by City of Hazelton v. Lozano*, 563 U.S. 1030 (2011).

compel the courts to strike down more of a law than the Constitution or statutory construction principles demand.

For all of those reasons, we hold that the proper constitutional remedy in this case is to sever Section 207(d)'s binding-arbitration provision and leave the balance of Section 207 and the 2008 Rail Act intact.

## C

When the Supreme Court remanded this case, it left open for this court's consideration a separate constitutional question: whether the appointment of Amtrak's president by its Board and not the President violates the Appointments Clause, given that Amtrak's president had a vote in establishing the metrics and standards. *American Railroads II*¸135 S. Ct. at 1234; *see* 2008 Rail Act § 202(a), Pub. L. No. 110-432, 122 Stat. at 4911. In *American Railroads III*, this court found it unnecessary to resolve that question given the separate determination that the statutory scheme stepped over the Due Process Clause line. 821 F.3d at 23.

The Railroad Association has raised the issue again in this appeal. We cannot answer that question because it is now moot. *See Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983). The May 2010 metrics and standards in which Amtrak's president had a role have already been vacated by the district court, and that unappealed aspect of the district court's decision is final. Nor does the Railroad Association face any forward-going risk of such an allegedly unconstitutional intrusion into the rulemaking process because Congress amended the statute in 2015 to require that the voting members of Amtrak's Board be appointed by the President and confirmed by the Senate. 49 U.S.C. § 24302(a)(1). As a

result, the Railroad Association's Appointments Clause claim is moot, and we lack jurisdiction to address it.

\*　　\*　　\*　　\*　　\*

We at long last come to the end of the tracks in this lengthy litigation. We hold that the constitutional violations previously identified by this court can be fully remedied by excising the binding-arbitration provision in Section 207(d) of the 2008 Rail Act, and that Section 207(d) is properly severable. The Railroad Association's Appointments Clause challenge is moot. We accordingly reverse the judgment of the district court and remand for the entry of judgment consistent with this opinion.

*So ordered.*

TATEL, *Circuit Judge*, dissenting: Two years ago, this court held that the Passenger Rail Investment and Improvement Act of 2008 (the "2008 Rail Act") "violates due process" because it "endows Amtrak with regulatory authority over its competitors." *Ass'n of American Railroads v. United States Department of Transportation* (*American Railroads III*), 821 F.3d 19, 34 (D.C. Cir. 2016). Adhering faithfully to that holding, the district court fit the remedy to the flaw by invalidating Section 207 of the Act—the section that authorizes Amtrak to work with the Federal Railroad Administration to develop passenger-rail performance metrics and standards that, we explained, impose enforceable obligations on Amtrak's competitors. *See id.* at 32–34. Case closed? Apparently not. According to my colleagues, the district court ought to have discerned from this court's prior opinion that "the linchpin for Amtrak's ability to unconstitutionally exercise regulatory authority" somehow lies in a discrete, never-used statutory subsection that authorizes an independent arbitrator unaffiliated with Amtrak to take the reins if Amtrak and the Administration fail to reach agreement on the content of the metrics and standards. Majority Op. at 8. Properly read, my colleagues hold, the prior opinion ruled only that "the Due Process Clause does not allow Amtrak *to use an arbitration process* to impose its preferred metrics and standards on its competitors," *id.* at 2 (emphasis added), such that the district court could—indeed should—have responded to the ruling by invalidating only the arbitration provision. Were our prior holding that narrow, I would agree that the district court was obliged to confine its declaratory remedy to the arbitration provision. In my view, however, our prior panel held that it is Amtrak's very participation in developing the metrics and standards under the Act—and not just the possibility that Amtrak might ultimately invoke the Act's arbitration provision—that contravenes due process. I would therefore affirm the district court's order invalidating Section 207 in full.

**I.**

Because understanding the background of this litigation, including the terms of the 2008 Rail Act and the specific challenges leveled against its constitutionality, will help readers to grasp the breadth of our prior holding, I begin with that background.

Congress enacted the 2008 Rail Act, Pub. L. No. 110-432, Div. B, 122 Stat. 4848, 4907, to address the "poor service, unreliability, and delays" that have historically dogged Amtrak's operations, *Department of Transportation v. Ass'n of American Railroads* (*American Railroads II*), 135 S. Ct. 1225, 1229 (2015). Central to this goal, Section 207 of the Act establishes, over the course of its four subsections, the regulatory regime at issue in this case. *See* 2008 Rail Act § 207, 122 Stat. at 4916–17 (codified at 49 U.S.C. § 24101 note). That regime's substantive core, laid out in subsection 207(a), is its requirement that Amtrak and the Department of Transportation's Federal Railroad Administration (the "Administration") "jointly . . . develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations," according to criteria such as cost-effectiveness and punctuality. 2008 Rail Act § 207(a). Although these metrics and standards principally regulate Amtrak's own operations, the freight railroads that host Amtrak's trains on their privately owned tracks can be liable for damages if their failure to "provide preference to Amtrak over freight transportation" causes Amtrak to fall short of the designated standards. 49 U.S.C. § 24308(f)(2); *see also id.* § 24308(c) (establishing private carriers' obligation to give preference to Amtrak).

Section 207's remaining three subsections facilitate the creation and implementation of the jointly authored metrics and standards envisioned in subsection 207(a). Subsection 207(b)

requires the Administration to produce a quarterly report on Amtrak's performance under the metrics and standards. 2008 Rail Act § 207(b). Subsection 207(c) provides that the metrics and standards must, as far as practicable, be "incorporate[d]" into Amtrak's service agreements with private track-owners. *Id.* § 207(c). And subsection 207(d) provides that if Amtrak and the Administration cannot agree on the content of the metrics and standards, either party may request that the Surface Transportation Board appoint an arbitrator to "assist the parties in resolving their disputes through binding arbitration." *Id.* § 207(d).

In 2010, Amtrak and the Administration, without resort to arbitration, developed the metrics and standards required by the Act. *See* Metrics and Standards for Intercity Passenger Rail Service under Section 207 of the Passenger Rail Investment and Improvement Act of 2008, 75 Fed. Reg. 26,839 (May 12, 2010). Shortly thereafter, the Association of American Railroads (the "Railroad Association") initiated this now six-and-a-half-year-old suit in federal district court. Drawing no distinctions among the Act's various subsections, the Railroad Association contended that Section 207 violates due process by "[v]esting the coercive power of the government in interested private parties," *i.e.*, Amtrak, and also contravenes constitutional separation-of-powers principles by "placing legislative and rulemaking authority in the hands of a private entity that participates in the very industry it is supposed to regulate." Complaint at 16–17, *Ass'n of American Railroads v. Department of Transportation*, 865 F. Supp. 2d 22 (D.D.C. 2012) (No. 1:11-cv-01499). As redress, the Railroad Association sought vacatur of the metrics and standards, as well as "an order declaring that Section 207"—in its entirety—"is unconstitutional." *Id.* at 3.

The district court granted summary judgment to the government, and the Railroad Association appealed, renewing its argument that "Amtrak's involvement in developing the metrics and standards" violates due process. *Ass'n of American Railroads v. Department of Transportation* (*American Railroads I*), 721 F.3d 666, 677 (D.C. Cir. 2013). We had no need to address that argument, however, because we held Section 207 unconstitutional on the alternative theory that it violates separation-of-powers principles by vesting regulatory authority in a "private corporation." *Id.* But after the Supreme Court vacated and remanded, holding that "for purposes of determining the validity of the metrics and standards, Amtrak is a governmental entity," *American Railroads II*, 135 S. Ct. at 1228, we returned to the previously unresolved due-process issue.

On that issue, we held that the 2008 Rail Act "violates the Fifth Amendment's Due Process Clause by authorizing an economically self-interested actor to regulate its competitors." *American Railroads III*, 821 F.3d at 23. Reasoning that "the due process of law is violated when a self-interested entity is 'intrusted with the power to regulate the business . . . of a competitor,'" *id.* at 31 (alteration in original) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)), we asked whether "Amtrak is (1) a self-interested entity (2) with regulatory authority over its competitors," *id.* As long as Section 207 remains in the picture, we held, the answer is "yes." Emphasizing Amtrak's statutory duty to maximize revenues, *see* 49 U.S.C. § 24101(d), we concluded that Amtrak is motivated by "economic self-interest" notwithstanding its governmental character, *American Railroads III*, 821 F.3d at 32. And, we went on, Section 207 grants Amtrak regulatory power over its competition because it gives Amtrak "the authority to develop metrics and standards—constrained very partially . . . by the [Administration] and the arbitrator," *id.* at

33—and because those metrics and standards "force freight operators to alter their behavior," *id.* at 32.

We also separately discussed two Appointments Clause arguments the Railroad Association had added to the mix over the course of litigation. One was aimed at the makeup of Amtrak's board of directors, and the other at the Act's arbitration provision, subsection 207(d). Deeming it a "close[] call" as to whether the Railroad Association had properly preserved the first of these arguments, we found that "our ultimate disposition" of the case "d[id] not require us to consider it." *Id.* at 24. But finding the second argument "properly presented for our review," *id.* at 27, we held that subsection 207(d) is unconstitutional because it empowers an arbitrator neither appointed through the constitutionally requisite procedures nor overseen by an officer so appointed "to render a final decision regarding the content of the metrics and standards" in the event of a dispute between Amtrak and the Administration, *id.* at 37.

Five months after our mandate issued, the government moved for entry of final judgment in the district court. Under the government's proposed order, the district court would, consistent with our holding, grant summary judgment to the Railroad Association and vacate the existing metrics and standards. But there was a catch. Rather than granting the Railroad Association the full relief it had sought, including a declaration that Section 207 is unconstitutional in its entirety, the proposed order would sever subsection 207(d)—the arbitration provision—from the remainder of Section 207 and invalidate only that subsection.

The district court rejected this gambit as "stand[ing] [the panel's decision] on its head." *Ass'n of American Railroads v. Department of Transportation*, No. 1:11-cv-01499, 2017 WL

6209642, at *2 (D.D.C. Mar. 23, 2017). The prior panel, the district court explained, "in addressing [subsection 207(d)], necessarily had the opportunity to find that the [2008 Rail Act] violated due process only insofar as it incorporated that subsection. . . . That it did not do so signals that the constitutional infection spread more broadly." *Id.* at *3. At any rate, the district court concluded, the prior panel's foregone opportunity to announce a holding limited to subsection 207(d) "foreclose[d] [the district court] from repeating [that] inquir[y]" because "[o]n an issue the Court of Appeals duly considered, [a district court] will not propose a narrower possible holding than what it adopted." *Id.* Accordingly, the district court granted summary judgment to the Railroad Association, vacated the metrics and standards, and declared Section 207 unconstitutional in its entirety. *See id.*

## II.

The government contends, and this court now agrees, that the district court committed legal error by declining to limit its declaratory remedy to subsection 207(d). I see things differently.

To begin on a point of agreement, it is well settled that the district court has "no power or authority to deviate from the mandate issued by an appellate court." *Independent Petroleum Ass'n of America v. Babbitt*, 235 F.3d 588, 596–97 (D.C. Cir. 2001) (quoting *Briggs v. Pennsylvania Railroad Co.*, 334 U.S. 304, 306 (1948)). Accordingly, the district court is foreclosed from fashioning a remedy that is "inconsistent with either the spirit or express terms of [an appellate panel's] decision." *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979). It is likewise common ground that the prior panel's judgment binds this panel no less than it bound the district court. "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions

rendered on the first appeal should not be revisited on later trips to the appellate court." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). This principle, we have observed, "encourages uniformity in the application of legal standards, enhances predictability in decisionmaking, promotes the interests of judicial efficiency and economy, and evinces respect for the efforts of earlier [panels] that have struggled to educe the appropriate legal norms." *Brewster v. Commissioner*, 607 F.2d 1369, 1373–74 (D.C. Cir. 1979) (per curiam).

Where my colleagues and I disagree is over the breadth of our prior panel's ruling. They believe that the prior panel held that Section 207 violates due process only insofar as it "allow[s] Amtrak *to use an arbitration process* to impose its preferred metrics and standards on its competitors." Majority Op. at 2 (emphasis added). Under this reading, the government's proposed remedy, which would strip the arbitration provision from the statute but otherwise leave Amtrak's joint role in developing the regulatory scheme that binds its competitors entirely intact, would indeed be "[]consistent with" our prior panel's decision. *Quern*, 440 U.S. at 347 n.18. In my view, however, our prior panel's ruling was far broader: Section 207's due-process defect lies in the fact that it allows Amtrak "to impose its preferred metrics and standards on its competitors" *at all*, Majority Op. at 2, whether by prevailing in a contested arbitration proceeding or simply by convincing the Administration to adopt its proposals. So understood, our prior holding permits no remedy short of the section's wholesale invalidation.

In concluding that the 2008 Rail Act violates due process, our prior panel never suggested that the constitutional flaw resides in any localized, potentially severable portion of Section 207—and certainly never breathed so much as a hint

that it resides in subsection 207(d). Instead, along with Amtrak's statutory duty to "maximize its revenues," 49 U.S.C. § 24101(d), the panel cited subsection 207*(a)*, which tasks "Amtrak, jointly with [the Railroad Association], . . . with developing the metrics and standards for passenger train operations, which directly impact freight train operations," as one of the "[t]wo undisputed features of the unique Amtrak scheme [that] set the stage for [the due-process] controversy," *American Railroads III*, 821 F.3d at 27. Having thus trained its focus on Amtrak's very participation in the regulatory process, the panel proceeded to confront the "specific fairness question" before it: "whether an economically self-interested entity may exercise regulatory authority over its rivals." *Id.* Over the course of seven pages, the panel determined, (1) "that the due process of law is violated when a self-interested entity is 'intrusted with the power to regulate the business . . . of a competitor,'" *id.* at 31 (alteration in original) (quoting *Carter Coal*, 298 U.S. at 311), (2) that Amtrak's "economic self-interest as it concerns other market participants is undeniable," *id.* at 32, and (3) that Section 207 "grants Amtrak, a self-interested entity, power to regulate its competitors," *id.* at 34, because it "gives Amtrak the authority to develop metrics and standards—constrained very partially . . . by the [Administration] and the arbitrator—that increase the risk that [the Surface Transportation Board] will initiate an investigation" that could result in a private rail carrier's liability, *id.* at 33. Based on these three determinations, the panel concluded that the Act "violates due process" because it "endows Amtrak with regulatory authority over its competitors." *Id.*

Subsection 207(d), which allows an *independent arbitrator* to play a regulatory role under certain circumstances, can hardly be said to "endow[] *Amtrak* with regulatory authority." *Id.* (emphasis added). Quite to the

contrary, the panel viewed the arbitrator as a "constrain[t]" on Amtrak's regulatory power. *Id.* at 33. To be sure, in an alternative holding, the panel also accepted the Railroad Association's "other" argument, that Section 207's arbitration provision runs afoul of the Appointments Clause. *Id.* at 36. But nothing in that discussion suggests that Section 207's *due-process* shortcomings likewise spring from that subsection.

Three additional considerations reinforce my view that the prior panel held Section 207 so fundamentally flawed as to be incapable of judicial salvage. First, not only did the panel conspicuously decline to signal that any remedial considerations remained for the district court to address on remand, but it also declared that although its ruling did not "foreclose *Congress* from tapping into whatever creative spark spawned the Amtrak experiment in public-private enterprise[,] . . . the Due Process Clause of the Fifth Amendment puts Congress to a choice: its chartered entities may *either* compete, as market participants, *or* regulate, as official bodies." *Id.* (first emphasis added). Why would the panel have described its ruling as leaving Congress a choice as to Amtrak's future role had it anticipated that the constitutional deficiency could be addressed without disturbing Section 207's essential underpinnings by simply severing subsection 207(d)? Second, had the panel meant to confine its due-process holding to that subsection, it surely would have addressed the Railroad Association's argument that Amtrak's board of directors is "constitutionally [in]eligible to exercise regulatory power." *Id.* at 23. Yet the panel declined to do so, concluding that the case's "ultimate disposition" obviated the need to resolve the issue. *Id.* at 24. This conclusion is self-explanatory if the panel believed that the Railroad Association's victory on the due-process issue entitled it to the full relief it sought, but not if the panel's holding handed the Railroad Association no more than a partial win. Finally, recall that neither Amtrak nor the

Administration invoked Section 207's arbitration provision in the course of developing the now-vacated 2010 metrics and standards. Accordingly, the invalidation of that provision alone would leave Amtrak and the Administration free to follow exactly the same path they previously traveled and arrive at exactly the same result. Yet readers would search our prior opinion in vain for any hint that the metrics and standards that arose out of "'[a] statute which . . . undertakes an intolerable and unconstitutional interference with personal liberty and private property' and transgresses 'the very nature of' governmental function" might be so easily resuscitated. *Id.* at 34 (quoting *Carter Coal*, 298 U.S. at 311).

Despite the foregoing, and the fact that our prior opinion says nothing at all about subsection 207(d) over the course of its seven-page explanation as to why Section 207 "violates due process," *id.* at 34, this court nonetheless reads the opinion to have "identifie[d] the arbitration provision as the critical constitutional fissure." Majority Op. at 10. In support, it points out that the prior panel, after having explained the basis for its constitutional conclusion, twice cited the arbitration provision as part of its explanation as to why "[n]one of the Government's numerous counterarguments" altered that conclusion. *American Railroads III*, 821 F.3d at 34. These two fleeting references cannot bear the dispositive weight my colleagues assign to them.

Our prior panel first cited subsection 207(d) when rejecting the government's argument that the Administration's role in promulgating the metrics and standards "operates as an 'independent check' on Amtrak's self-interestedness." *Id.* at 35. The panel, however, never identified that subsection as essential to its reasoning. It wrote, and I quote in full:

> To be sure, [the 2008 Rail Act] does require Amtrak and [the Administration] to "jointly" develop the metrics, but it's far from clear whether and in what way [the Administration] "checks" Amtrak. Both are subdivisions within the same branch and work in tandem to effectuate the goals Congress has set. Nowhere in the scheme is there any suggestion that [the Administration] must safeguard the freight operators' interests or constrain Amtrak's profit pursuits. *Moreover*, [the Administration] is powerless to overrule Amtrak. As joint developers, they occupy positions of equal authority. When there is intractable disagreement between the two, the matter is resolved by an arbitrator, who may ultimately choose to side with Amtrak. [The Administration] cannot keep Amtrak's naked self-interest in check, and therefore the requirement of joint development does not somehow sanitize the Act.

*Id.* (emphasis added) (footnote and citation omitted). My colleagues construe this passage as holding that, absent the arbitration provision, the 2008 Rail Act would pass constitutional muster by allowing for "the controlling intermediation of a neutral federal agency." Majority Op. at 11. But this reading leapfrogs over the panel's principal concern—reread the first three sentences—that the Administration is *not* a "neutral federal agency," *id.*, to focus exclusively on the panel's secondary rationale, hanging on by a "moreover," for holding that the Administration's involvement does not cure the Act's due-process deficiencies. Certainly, as my colleagues point out, *see id.* at 16, our prior panel noted that the Administration would be "presumptively disinterested" if left

to develop the metrics and standards "*alone*," *American Railroads III*, 821 F.3d at 35 (emphasis added) (quoting *Carter Coal*, 298 U.S. at 311). But the panel doubted the Administration's ability to remain impartial under the actual joint scheme at issue here, given that Section 207 requires the Administration to "work in tandem" with a self-interested "subdivision[] within the same branch" to regulate parties whose interests neither regulator has any incentive to "safeguard." *Id.*

The panel's second (and final) reference to subsection 207(d) in the due-process context appears in a footnote distinguishing a line of cases, including *Currin v. Wallace*, 306 U.S. 1 (1939), and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), in which "the [Supreme] Court has upheld arrangements under which regulatory burdens can be imposed by the joint action of a self-interested group and a government agency." *American Railroads III*, 821 F.3d at 34 n.4. The panel believed that these cases were "inapplicable" to Amtrak's position "because [the Administration's] authority to hold the line against overreaching by Amtrak is undermined by the power of the arbitrator." *Id.* But the mere fact that the panel found subsection 207(d) *sufficient* to distinguish the statutory scheme at issue here from those upheld in *Currin* and *Adkins* hardly suggests that, under the panel's theory of unconstitutionality, those cases would govern *but for* that subsection. Indeed, prior to this case's run up to the Supreme Court, that same panel in an earlier opinion found that Section 207 bore only "a passing resemblance to the humbler statutory frameworks in [*Currin*] and [*Adkins*]" and went on to distinguish those cases on grounds entirely unrelated to the arbitration provision. *American Railroads I*, 721 F.3d at 671; *see also id.* (noting that "[t]he industries in *Currin*," unlike Amtrak, "did not craft [industry] regulations" but merely had the opportunity to vote on whether to approve agency-written

regulations, and that "the agency in *Adkins* could unilaterally change regulations proposed to it by private parties, whereas" under the Act, "Amtrak enjoys authority equal to" the Administration's). The ready availability of alternate grounds for distinguishing *Currin* and *Adkins* strongly counsels against reading the panel's cursory, footnoted treatment of these cases to suggest that the due-process violation we held to inhere in Amtrak's "coercive regulatory power" under the Act, *American Railroads III*, 821 F.3d at 34, could somehow be cured by removing an independent "constrain[t]" on that power, *id.* at 33.

The broader point is this: these two references to subsection 207(d) nowhere suggest that removing the arbitrator as the final decision-maker, and thereby effectively allowing the Administration to veto Amtrak's regulatory proposals, would render Section 207 constitutional. Even accepting, as do my colleagues, that these references can be read together to establish our prior panel's acknowledgment that the Constitution would not "prohibit Amtrak from exercising some measure of joint control with a disinterested governmental agency, as long as that agency's duty to protect the 'public good' could check Amtrak's self-interest," Majority Op. at 10 (quoting *American Railroads III*, 821 F.3d at 29), we cannot ignore the panel's express determination that the Administration is neither disinterested nor tasked with "constrain[ing] Amtrak's profit pursuits," *American Railroads III*, 821 F.3d at 35, or acting as "a steward for the interests of freight operators" that are bound by the Amtrak-influenced metrics and standards, *id.* at 35 n.5. The "government's increasing reliance on public-private partnerships," the panel explained, "portends an . . . ill-fitting accommodation between the exercise of regulatory power and concerns about fairness and accountability." *Id.* at 31. Even if, as my colleagues see it, subsection 207(d) "empowered Amtrak to impose on its

competitors rules formulated with its own self-interest in mind" because "[a]ll Amtrak had to do was persuade the arbitrator to rule in its favor," Majority Op. at 11, removing that subsection would do nothing to satisfy our prior panel's concern that Amtrak could easily persuade the *Administration* to accede to its self-interested demands. After all, the Administration, more so than an independent arbitrator, lacks any structural incentive to stand up to Amtrak, a "subdivision[] within the same branch." *American Railroads III*, 821 F.3d at 35.

To the contrary, and for the reasons I have already given, removing subsection 207(d) would not correct the due-process deficiencies our prior panel perceived in Section 207. Put simply, the panel held that Section 207 violates due process because it allows "a self-interested entity" to exercise "regulatory authority over its competitors." *American Railroads III*, 821 F.3d at 31. The panel nowhere indicated that the arbitration provision renders Amtrak any more self-interested than it otherwise would be, and, far from viewing that provision as effectuating Amtrak's regulatory authority, the panel described the provision as a "constrain[t]" on that authority. *Id.* at 33. To be sure, as my colleagues point out, the prior panel, in so characterizing the arbitration provision, referenced its later "discuss[ion]" of *Currin* and *Adkins*. Majority Op. at 15 (quoting *American Railroads III*, 821 F.3d at 33). But nothing in that discussion says that the statutory subsection that "constrain[s]" Amtrak's regulatory authority is, paradoxically, the very source of that authority. *American Railroads III*, 821 F.3d at 33.

In my view, then, the district court correctly concluded that the government's proposed remedy would not address the 2008 Rail Act's constitutional flaws as the prior panel explained them. My colleagues are able to arrive at the opposite conclusion only by imputing to our prior panel a far narrower

theory of Section 207's unconstitutionality than it ever endorsed or even suggested.

## III.

The court today emphasizes the "grav[ity]" of invalidating a duly enacted statute and our duty as the judiciary to do as little damage as possible to the work of the elected branches of government. Majority Op. at 9. "[W]hen a constitutional question must be joined," my colleagues observe, "courts must choose the narrowest constitutional path to decision." *Id.* But these important concerns, which I share, also bound our prior panel. *See El Paso & Northeastern Railway Co. v. Gutierrez*, 215 U.S. 87, 96 (1909) ("[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the *duty* of [a] court to so declare . . . ." (emphasis added)). Out of "respect for [its] efforts," *Brewster*, 607 F.2d at 1373, I would presume that our prior panel well heeded its obligation to "act cautiously" when "review[ing] the constitutionality of a legislative Act," *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion), and that its decision not to confine its due-process holding to any single statutory subsection reflects its considered judgment that Section 207's constitutional flaws are fatal to the whole.

If the government disagrees with this assumption and believes that our prior panel simply neglected its obligation to consider whether it could dispose of the Railroad Association's due-process challenge on narrower grounds, then it should have said as much in its petition for rehearing en banc. After all, if a panel that holds an Act of Congress unconstitutional fails to consider whether it can cast its holding more narrowly, it commits an error that may well justify en banc review. *See generally* D.C. Cir. R. 35(a) (allowing for en banc review where a matter "involves a question of exceptional importance"). But in its en banc petition, the government did

not argue that the panel should have considered a more targeted constitutional holding—say, for example, the one this court adopts today. Had it done so, I might well have voted to rehear the case en banc. But that argument having never been made and rehearing en banc having been denied, we are now bound by that panel's holding—whatever we think of it. *See, e.g.*, *United States v. Kolter*, 71 F.3d 425, 431 (D.C. Cir. 1995) ("This panel would be bound by [a prior panel's] decision even if we did not agree with it."); *Ass'n of Civilian Technicians, Montana Air Chapter v. FLRA*, 756 F.2d 172, 176 (D.C. Cir. 1985) (*stare decisis* principles "would be undermined if previous decisions were open to reconsideration merely because they were debatable").

Once our prior panel's opinion became final, the "legal donnybrook over the bounds of congressional power" that this case once posed came to an end. Majority Op. at 2. The only task that remained for the district court was to enter relief that honored this court's binding resolution of the legal issues in play. Because I believe the district court fulfilled its obligation, giving our prior panel's opinion its most natural reading, I respectfully dissent.