# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 5, 2020        Decided August 28, 2020

No. 19-5079

ABDULSALAM ALI ABDULRAHMAN AL HELA, DETAINEE CAMP
DELTA,
APPELLANT

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01048)

*Andrew D. Garrahan* argued the cause for appellant. With him on the briefs were *Brian E. Foster*, *S. William Livingston*, *Megan O'Neill*, and *David H. Remes*. *Cyril Djoukeng* entered an appearance.

*Brad Hinshelwood*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: GRIFFITH and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH.

RAO, *Circuit Judge*: Abdulsalam Ali Abdulrahman Al Hela filed a habeas petition challenging his detention at the U.S. Naval Station at Guantanamo Bay, Cuba. The district court denied the writ after a full hearing on the merits. On appeal, Al Hela claims that the President lacks authority to detain him for substantially supporting Al Qaeda and its associated forces; that he is entitled to release for violation of both "substantive" and "procedural" due process; and that the district court's discovery procedures failed to provide him with a "meaningful opportunity" to challenge his detention under the Suspension Clause. We affirm the district court because the President has authority to detain Al Hela and the proceedings below complied with the requirements of the Suspension Clause. We reject Al Hela's due process claims because the Due Process Clause may not be invoked by aliens without property or presence in the sovereign territory of the United States.

## I.

Al Hela is a Yemeni citizen, tribal sheikh, and businessman with connections to prominent political officials in Yemen's government. Throughout the 1990s and early 2000s, Al Hela assisted the Political Security Organization, an internal security and intelligence service of the Yemeni government, with the deportation of foreign Arabs who settled in Yemen after the conclusion of the Soviet-Afghan War. During this time, Al Hela also maintained contact with several

known and suspected affiliates of Al Qaeda and two associated terrorist organizations known as the Egyptian Islamic Jihad and the Aden-Abyan Islamic Army. Al Hela disappeared during a business trip to Egypt in 2002 under circumstances irrelevant to this appeal. U.S. forces later obtained custody of Al Hela and have detained him at Guantanamo Bay since 2004.[1]

In 2005, Al Hela petitioned the U.S. District Court for the District of Columbia for a writ of habeas corpus, arguing the President lacks authority to detain him under the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF"). The proceedings moved forward after the Supreme Court held in *Boumediene v. Bush* that the Suspension Clause guarantees alien detainees at Guantanamo Bay a "meaningful opportunity" to challenge the basis for their detention through habeas review. 553 U.S. 723, 779 (2008); *see* U.S. CONST. art. I, § 9, cl. 2. To comply with this requirement, the judges of the U.S. District Court for the District of Columbia developed a standing case management order used in many Guantanamo habeas cases to manage discovery and to protect classified information from unwarranted disclosure. *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, 2008 WL 4858241 (D.D.C. Nov. 6, 2008), *as amended*, 2008 WL 5245890 (D.D.C. Dec. 16, 2008).

As applied in Al Hela's case, the case management order required the government to provide a factual return detailing the allegations and evidence supporting his detention, disclose

---

[1] This court reviewed both classified and unclassified materials in the course of deciding Al Hela's appeal. Because the unclassified record and briefing are sufficient to support our decision, this opinion contains no classified information. To the extent the district court's findings of fact rely on classified information, we have reviewed the complete record and are satisfied the court's consideration of the evidence was reasonable.

any material exculpatory information in its possession, and perform certain additional discovery upon request. *See id.* §§ I.A, I.B, I.C, I.D, I.E. The order protected classified material contained within these filings by providing for three tiers of information access. First, Al Hela was permitted to view an unclassified summary of the factual return along with a limited number of excerpts from other documents. *See id.* § I.F. Second, Al Hela's counsel was allowed to view most of the classified information in the factual return and supporting exhibits under a protective order. *See id.* Third, the government was permitted to withhold particularly sensitive classified information altogether by obtaining permission from the court after an ex parte, in camera review of the material. *See id.*

In the years that followed, Al Hela filed a series of motions for additional discovery that the district court denied. Al Hela first argued the Suspension and Due Process Clauses required that his counsel be allowed to access the government's ex parte filings, which sought to exempt particularly sensitive classified material from disclosure. The court denied access because the filings described the underlying sensitive classified information. Order, *Al Hela v. Obama*, No. 05-cv-1048 (D.D.C. Nov. 19, 2014). Next, Al Hela moved for personal access to the classified factual return given to his counsel. Although Al Hela argued the unclassified summary and limited excerpts provided to him were insufficient to mount a meaningful challenge to his detention, the district court found existing disclosures met all applicable constitutional requirements. *See Al Hela v. Obama*, No. 05-cv-1048, 2016 WL 2771804, at *2 (D.D.C. May 13, 2016).

The district court denied Al Hela's habeas petition after a full hearing on the merits. First, the court interpreted the AUMF and related statutes to permit the detention of individuals who "substantially supported" covered terrorist

organizations in ways not directly related to hostilities against the United States and its allies. *Al Hela v. Trump*, No. 05-cv-1048, unclass. slip op. at 9–21 (D.D.C. Jan. 28, 2019). Second, the court rejected Al Hela's claim that he was entitled to release under the Due Process Clause, holding that "the due process clause does not apply to Guantanamo detainees." *Id.* at 23 (citing *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) ("*Kiyemba I*"), *vacated and remanded*, 559 U.S. 131, *judgment reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam) ("*Kiyemba III*")). Third, the court concluded after an ex parte, in camera review that the government's intelligence reports were sufficiently reliable to support Al Hela's detention despite containing anonymous, multi-layered hearsay. *Id.* at 24–28. Finally, the court determined the government put forward sufficient evidence to demonstrate Al Hela "substantially supported" Al Qaeda and associated forces under the AUMF detention standard. *Id.* at 80–82. Specifically, Al Hela was a trusted and reliable member of international terrorist networks after participating in jihad against the Soviet Union in Afghanistan in the late 1980s. *Id.* at 33–34, 69–80. In the years leading up to Al Hela's disappearance and detention, terrorist leaders relied on Al Hela to transport fighters within Yemen and across regional borders in furtherance of attacks against the United States and its allies, including by leveraging his government contacts to procure fake identification and travel documents. *Id.* at 36–67.

Al Hela appeals, asking that we order his conditional release to a foreign nation on the statutory ground that the President exceeded the scope of his AUMF authority and on the constitutional ground that his detention without trial violates "substantive" due process.[2] Further, Al Hela argues the

---

[2] Conditional release is a remedy that allows federal courts to "delay the release of a successful habeas petitioner in order to provide the

district court's discovery and evidentiary rulings violated the procedural guarantees of the Suspension and Due Process Clauses. We have jurisdiction over Al Hela's appeal. *See* 28 U.S.C. §§ 2241, 2253(a).

## II.

We begin with the President's statutory authority to detain Al Hela at the U.S. Naval Station at Guantanamo Bay. Al Hela asks us to reverse and remand with instructions to order his conditional release because the President exceeded the scope of his statutory detention authority. We conclude that the President has authority to detain Al Hela for "substantially support[ing]" Al Qaeda and its associated forces and that the district court correctly determined the government's evidence justifies his ongoing detention.

## A.

After the terrorist attacks of September 11, 2001, Congress authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he

---

[government] an opportunity to correct the constitutional violation found by the court." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987); *see also Boumediene*, 553 U.S. at 779 (holding the Suspension Clause requires habeas courts have the power to order conditional release). With respect to Guantanamo detainees, a central remedial question is where detainees will be released given "the exclusive power of the political branches to decide which aliens may, and which aliens may not, enter the United States." *Kiyemba III*, 605 F.3d at 1048. Although no foreign government has yet agreed to accept him, Al Hela "believes that, once his release is approved, he can obtain a statement from an allied Persian Gulf nation saying that he would be welcomed there, is not and has not been a threat to security, and would not raise security concerns." Al Hela Unclass. Br. 76 n.18.

determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." AUMF § 2(a). The AUMF authorizes the President to detain any individual who is part of or supported Al Qaeda, the Taliban, or associated forces. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518–19 (2004) (plurality opinion of O'Connor, J.); *Al Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010).[3] In the National Defense Authorization Act for Fiscal Year 2012 ("2012 NDAA"), Congress reaffirmed that the AUMF permits the President to detain, "pending disposition under the law of war," any person

> who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

Pub. L. No. 112-81, § 1021(a), (b)(2), 125 Stat. 1298, 1562 (2011). Further, Congress explicitly provided that the President may detain such persons "without trial until the end of the hostilities authorized by the [AUMF]." *Id.* § 1021(c)(1).

When a detainee files a habeas petition, the government bears the burden of proving "by a preponderance of the evidence" that the detainee was "part of or substantially supported" enemy forces. *Ali v. Obama*, 736 F.3d 542, 544 &

---

[3] Since 2001, each President has relied on the AUMF, as well as constitutional authorities, to detain captured terrorists at Guantanamo Bay. *See* Exec. Order No. 13,823, 83 Fed. Reg. 4,831 (Jan. 30, 2018); Exec. Order No. 13,492, 74 Fed. Reg. 4,897 (Jan. 22, 2009); Military Order of Nov. 13, 2001, 66 Fed. Reg. 57,833.

n.1 (D.C. Cir. 2013). *But see Al Bihani*, 590 F.3d at 878 & n.4 (reserving the question whether lesser standards of proof could be constitutionally adequate). Al Hela maintains that the district court misinterpreted the 2012 NDAA and that the record does not support the court's finding that he substantially supported Al Qaeda and associated forces.

1.

First, Al Hela argues his detention cannot be upheld based on substantial support alone because the 2012 NDAA requires the government to also show that his support rendered him "effectively a part of the enemy armed forces." Al Hela Unclass. Br. 25; *see Al Hela*, No. 05-cv-1048, unclass. slip op. at 33 (approving Al Hela's detention based on substantial support alone). In detainee cases, "[t]he sources we look to for resolution [of statutory questions] are the sources courts always look to: the text of relevant statutes and controlling domestic caselaw." *Al Bihani*, 590 F.3d at 871–72.

Al Hela's interpretation is inconsistent with the plain text of the 2012 NDAA. Congress explicitly authorized the President to detain persons who were "part of *or* substantially supported al-Qaeda, the Taliban, or associated forces." 2012 NDAA § 1021(b)(2) (emphasis added). The prongs are disjunctive, suggesting that a person may be detained if either condition is met. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) ("'[O]r' is 'almost always disjunctive.'" (citation omitted)).

The statutory history and practice that preceded the enactment of the 2012 NDAA are also inconsistent with Al Hela's argument that the "substantially supported" standard covers only persons who were "effectively a part of" an enemy force. Congress enacted the 2012 NDAA in light of standards developed by the judiciary and the Executive under several

earlier statutes dealing with the War on Terror, including the AUMF, the Detainee Treatment Act of 2005, and the Military Commissions Acts of 2006 and 2009. As we noted in *Al Bihani*, these statutes authorizing detention and other uses of force provided a framework for detention while also "grant[ing] the government the power to craft a workable legal standard to identify individuals it can detain." 590 F.3d at 872. Prior to the 2012 NDAA, this court understood the AUMF to authorize the government "to detain anyone who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." *Id.* In applying that definition, we concluded "that both prongs"—"part of" and "substantially supported"—"are valid criteria that are independently sufficient to satisfy the standard." *Id.* at 873–74.

Our decision in *Al Bihani* also relied heavily on language in the Military Commissions Act of 2006, which authorized trial by military commission of "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States." Pub. L. No. 109-366, § 3, 120 Stat. 2600, 2601; *see also* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1802, 123 Stat. 2190, 2575 (2009) (importing substantially the same definition into the Military Commissions Act of 2009). We explained that the scope of AUMF detention authority "logically covers a category of persons no narrower than is covered by [the] military commission authority," because persons subject to trial by military commission must necessarily also be subject to detention. *Al Bihani*, 590 F.3d at 872. Although Congress used the phrase "substantially supported" in the 2012 NDAA rather than "materially supported," the phrase used in earlier statutes, these terms are largely synonymous. *Compare Materially*, Oxford English Dictionary (3d ed. 2001) ("To a material or important extent; significantly; substantially;

considerably."), *with Substantially*, *id.* ("Fully, amply; to a great extent or degree; considerably, significantly, much."). This interpretive background reinforces the plain meaning of the 2012 NDAA. Congress adopted a definition virtually identical to the one approved in *Al Bihani*, in which we held a person may be detained if he was either part of or supported Al Qaeda, the Taliban, or associated forces. Nothing in the text, structure, or statutory background of the 2012 NDAA suggests that a person who "substantially supported" enemy forces must be "effectively a part of" those forces.

Al Hela also reads the 2012 NDAA to require proof of direct support for hostilities to satisfy the "substantially supported" standard. Recall the statute allows detention of any person who

> substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

2012 NDAA § 1021(b)(2). Al Hela places great weight on the clause "including any person who has … directly supported such hostilities." Yet the word "including" typically introduces specific examples rather than a comprehensive definition. *Cf. United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle."). Under the 2012 NDAA, persons who "directly support[] such hostilities" may be detained, but they are not the only persons within the definition of detainable persons. Put another way, if a person directly supported enemy

forces, that meets the 2012 NDAA standard for substantial support; however, the converse is not true, because a person may be found to substantially support enemy forces without directly supporting them.

Al Hela further argues that "involvement in hostilities [is] a prerequisite for a finding of substantial support" and that "the support must take place *in hostilities against U.S. Coalition partners*" to justify detention. Al Hela Unclass. Br. 23–24 (cleaned up). This argument has no basis in the 2012 NDAA's text, which does not require involvement in hostilities. Instead, the phrase "engaged in hostilities" describes which "associated forces" fall within the definition's scope, but does not define the type of support sufficient for detention. 2012 NDAA § 1021(b)(2). Similarly, the phrase "who has committed a belligerent act" falls within the "including" clause and merely states one example of the type of conduct within the statute's scope. *Id.* Involvement in hostilities has never been a prerequisite for detention under the AUMF. In *Al Bihani*, for example, the petitioner traveled with a Taliban-allied brigade and "carried a brigade-issued weapon, but never fired it in combat." 590 F.3d at 869. As we explained, Al Bihani's primary role as the brigade's cook was enough to establish substantial support. *Id.* at 873. In the AUMF, the 2012 NDAA, and other statutes related to the War on Terror, Congress has consistently recognized that even indirect support for hostilities against the United States and its allies justifies the use of force, including detention.[4]

---

[4] The Supreme Court has interpreted analogous statutes targeting "material support" for terrorist organizations to encompass indirect support. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 29–39 (2010) (interpreting 18 U.S.C. § 2339B(a)(1), which makes it

Finally, our cases interpreting the "part of" prong of the 2012 NDAA have also squarely rejected direct participation in hostilities as a categorical requirement: "In order to detain individuals who were part of the Taliban or al-Qaeda forces, proof that the individuals also actively engaged in combat against the United States and its allies is unnecessary." *Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012); *see also Hussain v. Obama*, 718 F.3d 964, 967–68 (D.C. Cir. 2013) (rejecting argument that detainee must have engaged in direct hostilities); *Uthman v. Obama*, 637 F.3d 400, 402–04 (D.C. Cir. 2011) (approving detention without evidence of direct participation in hostilities). We therefore hold the AUMF and the 2012 NDAA authorize the President to detain individuals who "substantially supported" enemy forces irrespective of whether they also directly supported those forces or participated in hostilities.

2.

Al Hela also argues that the timing of his allegedly supportive activities undermines the government's basis for detention. First, Al Hela maintains that the AUMF and the 2012 NDAA distinguish support offered before the attacks of September 11, 2001, and support offered after. On his interpretation, support offered *before* September 11 justifies detention only if directly related to the attacks, whereas support unrelated to the attacks justifies detention only if offered *after* September 11. Al Hela Unclass. Br. 26–27. As such, Al Hela claims the government's evidence fails to justify detention because his allegedly supportive conduct occurred before September 11 and was unrelated to the attacks. Yet support for covered terrorist organizations before September 11 is

---

unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization").

unquestionably a proper basis for detention whether or not related to the attacks.

The AUMF authorizes the use of "all necessary and appropriate force against those" who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, *or harbored such organizations or persons*." AUMF § 2(a) (emphasis added). Congress's authorization of force against those who "harbored" covers a far broader range of activity than support for individual acts of terrorism. *See Al Bihani*, 590 F.3d at 873. We have sustained detention of terrorist organization members based on pre-September 11 conduct that was not directly related to executing the attacks. *See, e.g.*, *Khairkhwa*, 703 F.3d at 548–49 (detailing funding and leadership activities within the Taliban in the 1990s and early 2000s unrelated to the September 11 attacks); *Al Bihani*, 590 F.3d at 869 (describing involvement in a Taliban-allied brigade in early 2001 with no direct connection to the September 11 attacks). Although many of these cases involved detainees found to be "part of" a defined terrorist group, rather than those who "substantially supported" such a group, this distinction does not alter the government's detention authority under the AUMF.

Second, Al Hela argues that his alleged support for Al Qaeda and its associated forces was too sporadic and informal to constitute substantial support by the time of his disappearance and subsequent detention. This argument misunderstands the nature of habeas review under the AUMF and the 2012 NDAA. Whether the passage of time between supportive conduct and capture undermines detention depends on the facts of a particular case, and courts must weigh the evidence as a whole to determine whether the detainee "substantially supported" covered terrorist organizations. *See Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010). Al Hela

attempts to rely on *Al Ginco v. Obama*, in which the district court found the record did not support detention because, after developing a relationship with Al Qaeda, the petitioner was detained and tortured by the organization as a suspected spy. 626 F. Supp. 2d 123, 129–30 (D.D.C. 2009). By contrast, here the district court correctly determined Al Hela's supportive conduct was not "vitiated by the passage of time" based on the nature of Al Hela's relationship with terrorist organizations, the lack of intervening conduct suggesting an abandonment of the relationship, and the mere sixteen months between his final support and disappearance. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 80.

3.

In addition, Al Hela challenges the district court's findings that the Egyptian Islamic Jihad ("EIJ") and the Aden-Abyan Islamic Army ("AAIA") were "associated forces" of Al Qaeda under the 2012 NDAA. While we review the district court's underlying factual findings for clear error, the district court's ultimate conclusion that Al Qaeda and another force were associated for the purposes of the AUMF and the 2012 NDAA is a legal finding reviewed de novo. *See Khan v. Obama*, 655 F.3d 20, 26 (D.C. Cir. 2011).

The EIJ "entered the fight alongside al Qaeda … in hostilities against the United States or its coalition partners as part of the same comprehensive armed conflict." *Al Hela*, No. 05-cv-1048, unclass. slip op. at 17. Beginning in the 1970s, the EIJ operated cells throughout the Middle East, including Yemen, and participated in bombing attacks against United States allies in the 1990s. By 1998, its leader was a deputy to Osama bin Laden and signed onto the Al Qaeda leader's fatwa encouraging the murder of Americans. *Id.* at 29–30. By June 2001, just over a year prior to Al Hela's disappearance, the EIJ

appears to have formally joined Al Qaeda. *Id.* at 31. Both the United States and the United Nations Security Council considered the EIJ a foreign terrorist organization affiliated with Al Qaeda. *Id.* at 30. This evidence compares favorably to that in *Khan*, where we determined Hezb–i–Islami Gulbuddin was an associated force of the Taliban because it participated in joint recruiting efforts and conducted attacks against United States forces. 655 F.3d at 32–33.

Likewise, the AAIA entered the fight against the United States and its allies alongside Al Qaeda prior to Al Hela's disappearance and detention. The district court noted the AAIA has been dedicated to the violent overthrow of Yemen's government since 1998, participated in several bombings, and kidnapped sixteen American, British, and Australian tourists. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 31–32. By 2001 the organization had proclaimed support for Al Qaeda's leadership and conducted multiple attacks against the United States and its allies abroad. Both the United States and the United Nations Security Council considered the AAIA a foreign terrorist organization affiliated with Al Qaeda. *Id.*

We conclude the district court's factual findings were reasonable and demonstrate sufficient connections between Al Qaeda and the EIJ and AAIA to render those groups "associated forces" as a matter of law.

4.

Finally, Al Hela argues that even if the district court interpreted the 2012 NDAA correctly, the record contains insufficient evidence to conclude he substantially supported Al Qaeda, the EIJ, or the AAIA. Whether Al Hela's detention is justified is a mixed question of law and fact. *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010). Whether the alleged conduct occurred is a factual question reviewed for

clear error, but whether that conduct qualifies as substantial support under the 2012 NDAA is a question of law reviewed de novo. *Id.*; *see Khan*, 655 F.3d at 26. On this record we have no difficulty concluding that the district court's thorough findings demonstrate Al Hela "substantially supported" Al Qaeda, the EIJ, and the AAIA.

The court reasonably found that Al Hela was a trusted member of the international jihadi community for decades and facilitated the travel of known terrorists by providing travel documents and false identities. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 33, 37–54, 77. Further, the court reasonably found Al Hela provided or was asked to provide planning and logistical support related to several actual or aborted attacks against the United States and its allies. *Id.* at 54–70. The unclassified and classified records in this case demonstrate that the district court did not clearly err when drawing inferences and weighing the evidence. The court's factual findings— longstanding jihadi ties, facilitating covert international travel, and indirectly supporting actual or attempted attacks—confirm that Al Hela substantially supported enemy forces. *Cf. Al Bihani*, 590 F.3d at 872–73 (concluding a petitioner's "traditional food operations essential to a fighting force and the carrying of arms" made him detainable under the AUMF for substantially supporting enemy forces).

Accordingly, we affirm the district court's determination that the AUMF and the 2012 NDAA permit the President to detain Al Hela because he "substantially supported" Al Qaeda and its associated forces, the EIJ and the AAIA.

B.

Whatever the scope of the President's authority when Congress passed the AUMF in 2001, Al Hela argues that this authority has "unraveled" as the War on Terror has extended in

duration from years to decades. He relies on the *Hamdi* plurality opinion, which, after concluding "based on longstanding law-of-war principles" that the AUMF permitted detention, noted that this "understanding may unravel" "[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war." 542 U.S. at 521. According to Al Hela, his detention now falls outside law of war principles and amounts to a "life sentence" because the War on Terror is "a war without end." Al Hela Unclass Br. 64–65.

We recently rejected an identical argument, observing that the AUMF and the 2012 NDAA impose no time limit on the President's authority to detain enemy combatants. *Al Alwi v. Trump*, 901 F.3d 294, 297–300 (D.C. Cir. 2018); 2012 NDAA § 1021(a) (authorizing detention "pending disposition under the law of war"), (c)(1) (stating that "pending disposition under the law of war" includes detention "without trial until the end of the hostilities authorized by the [AUMF]"); *see also Ali*, 736 F.3d at 552 ("[T]he 2001 AUMF does not have a time limit.").

The government maintains that the War on Terror is an ongoing conflict involving combat operations by the United States and its allies abroad. Courts lack the authority or the competence to decide when hostilities have come to an end. "The 'termination' of hostilities is 'a political act.'" *Al Alwi*, 901 F.3d at 299 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 168–69 (1948)). So long as the record establishes the United States military is involved in combat against Al Qaeda, the Taliban, or associated forces, we have no warrant to second guess fundamental war and peace decisions by the political branches. *See id.* at 300; *Al Bihani*, 590 F.3d at 874 ("The determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter."). The Constitution vests the war powers in Congress

and the President. An essential aspect of the war powers is the initiation and cessation of armed conflict—decisions that rest squarely with the political branches and are outside the scope of judicial review. Based on the record before us, we readily accept the government's representation that hostilities have not ended.

\* \* \*

The AUMF and the 2012 NDAA authorize the detention of persons who are "part of" or "substantially supported" Al Qaeda, the Taliban, or associated forces. In recognition of the global and diffuse nature of the conflict, this definition covers not only those who are part of covered terrorist organizations or directly aid hostilities, but also those who substantially support the organizations by facilitating the logistics and planning that make their activities possible. Under this well established standard, the government demonstrated Al Hela substantially supported Al Qaeda and its associated forces within the meaning of the 2012 NDAA.

III.

Next, we consider whether the district court's evidentiary and discovery rulings complied with the requirements of the Suspension Clause by providing Al Hela a meaningful opportunity to challenge his detention. Al Hela claims the court erred by relying on anonymous hearsay and by denying him access to the charges and evidence against him. More than a decade of case law has defined the procedures required to guarantee detainees the meaningful opportunity for habeas review required by the Suspension Clause while respecting national security prerogatives and the separation of powers. Under these precedents, we affirm the district court's discovery and evidentiary rulings as constitutionally sound.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. Under certain circumstances, aliens detained abroad by the United States are entitled to a "meaningful opportunity" to challenge the statutory basis for their detention through habeas review before a court with the power to order conditional release. *Boumediene*, 553 U.S. at 779; *see Al Maqaleh v. Gates*, 605 F.3d 84, 93–94 (D.C. Cir. 2010) (applying *Boumediene* to determine when aliens abroad are covered by the Suspension Clause). We review the district court's evidentiary and discovery rulings for abuse of discretion and reliability findings for clear error, *Al Alwi v. Obama*, 653 F.3d 11, 15, 19 (D.C. Cir. 2011), but review de novo any errors of law on which the court relied when exercising its discretion, *Ameziane v. Obama*, 620 F.3d 1, 5 (D.C. Cir. 2010).

First, Al Hela argues that the Suspension Clause bars reliance on evidence containing multiple layers of anonymous hearsay and that the district court erred by relying on government intelligence reports based on such information. As we held in *Al Bihani*, hearsay evidence is "always admissible" in Guantanamo habeas proceedings and its use requires reversal only when the hearsay undermines "the baseline level of evidentiary reliability necessary for the 'meaningful' habeas proceeding *Boumediene* requires under the Suspension Clause." 590 F.3d at 879. Thus, the question before the district court is not whether to admit the hearsay evidence, "but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Id.* We also noted that the typical concerns surrounding hearsay are mitigated in this context because "district judges are experienced and sophisticated fact finders" whose "eyes need not be protected from unreliable information

in the manner the Federal Rules of Evidence aim to shield the eyes of impressionable juries." *Id.* at 880.

Here, the district court found the challenged evidence reliable after an ex parte, in camera review of the source material. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 25–26. As official government records, intelligence reports receive a rebuttable "presumption of regularity," even when they include layered hearsay information from non-governmental sources. *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). In any event, layers of anonymous hearsay do not deprive a detainee of "meaningful" proceedings so long as the district court determines the underlying classified sources contain more than "bottom-line assertions" and reasonably specify the who, what, and where of the detainee's conduct. *Parhat v. Gates*, 532 F.3d 834, 846–47 (D.C. Cir. 2008); *see also Khan*, 655 F.3d at 31 (approving intelligence reports that contained sufficient indicia of reliability); *Awad*, 608 F.3d at 7 (noting that "hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable"). Ex parte, in camera review allows the district court to consider the government's underlying sources to ensure the final intelligence report is sufficiently reliable. We identify no clear error in the district court's thorough analysis of the intelligence reports in this case.

Second, Al Hela claims that personal access to the charges and evidence against him is essential to the "meaningful opportunity" guaranteed by the Suspension Clause and that the district court erred by denying his motion for personal access to classified information. *See Al Hela*, 2016 WL 2771804, at *2 (denying discovery motion). The Suspension Clause, however, does not guarantee an absolute right personally to access the government's evidence in a habeas proceeding.

Rather, we have encouraged the "search for reasonable alternatives" to the disclosure of sensitive information, including the use of summaries that "accurately represent[] the information contained in the [intelligence] reports." *Khan*, 655 F.3d at 31. The government has a compelling interest in protecting classified information. *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). We have sought to respect this interest by disclosing certain classified information only to attorneys with a security clearance, *see Al Odah v. United States*, 559 F.3d 539, 544–45 (D.C. Cir. 2009), and we have never required such disclosure directly to a detainee. Here, the government "provide[d] specific and persuasive reasons to believe that further disclosure of the allegations against petitioner and the factual bases therefor would risk revealing U.S. intelligence sources and methods." *Al Hela*, 2016 WL 2771804, at *3. The government's unclassified summary provided Al Hela a "broad overview of many (but not all) of the facts and allegations" against him. *Id.* at *1. The district court managed classified information in a manner consistent with our precedents on the requirements of habeas review.

Third, Al Hela claims the district court violated the Suspension Clause by denying his cleared counsel access to certain sensitive classified information in the government's ex parte filings. *See* Order of Nov. 19, 2014, *Al Hela*, No. 05-cv-1048 (denying discovery motion). Yet it is well established that "the government may withhold classified national security material consistent with its 'legitimate interest in protecting sources and methods of intelligence gathering.'" *Obaydullah v. Obama*, 688 F.3d 784, 796 (D.C. Cir. 2012) (quoting *Boumediene*, 553 U.S. at 796). We have repeatedly approved ex parte filings as an essential procedural mechanism for protecting classified information critical to national security. *See id.*; *Khan*, 655 F.3d at 31 (noting that "where the source of classified information is 'highly sensitive'" it can be shown to

the court alone (quoting *Parhat*, 532 F.3d at 849)). As discussed above, Al Hela's cleared counsel had access to the government's factual return and supporting exhibits. When denying Al Hela's habeas petition, the district court relied on the ex parte filings primarily to corroborate the reliability of redacted sources underlying the intelligence reports available to Al Hela's counsel. *See, e.g.*, *Al Hela*, No. 05-cv-1048, unclass. slip op. at 26. We affirm the district court's decision to allow the government's ex parte filings because such filings are well within our precedents and Al Hela points to nothing in the record suggesting an abuse of discretion.

In the wake of *Boumediene*, Guantanamo detainees are entitled to a "meaningful opportunity" to challenge the basis for their detention, not a perfect one. The court is not tasked to "administrate a complicated clash of adversarial viewpoints to synthesize a process-dependent form of Hegelian legal truth." *Al Bihani*, 590 F.3d at 880. While courts in this context must confirm the government acted within its authority, they must apply Suspension Clause standards with sensitivity to national security interests and with respect for the war powers vested in the political branches. We are satisfied the district court properly ensured Al Hela a "meaningful opportunity" to challenge the basis for his detention on habeas review.

IV.

Finally, Al Hela urges this court to extend the due process protections of the Fifth Amendment to noncitizen detainees at Guantanamo Bay. Relying on our decision in *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019), Al Hela separates his due process claim into two parts: first, a "substantive" challenge to his indefinite detention; and second, several "procedural" challenges to his habeas proceedings. We first set out the

framework for due process challenges and then address each of Al Hela's arguments in turn.

## A.

The Due Process Clause of the Fifth Amendment provides "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Amendment's protections apply to all "person[s]" within the United States, citizens and noncitizens alike. *Mathews v. Diaz*, 426 U.S. 67, 77–80 (1976); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The[] provisions [of the Fourteenth Amendment] are universal in their application, to all persons within the territorial jurisdiction."). In *Johnson v. Eisentrager*, the Court held the Fifth Amendment does not apply to aliens located outside the United States: "[T]he Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States." 339 U.S. 763, 785 (1950); *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.").

*Eisentrager* addressed whether the Fifth Amendment applies to aliens abroad—specifically, enemy combatants detained by American military forces in Germany. In answering this question categorically in the negative, the Court noted:

> If the Fifth Amendment confers its rights on all the world except Americans engaged in defending it, the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms,

territorially or as to persons. Such a construction … could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has ever hinted at it. The practice of every modern government is opposed to it.

339 U.S. at 784–85 (citation omitted). Building on earlier cases, the Court held in no uncertain terms that the Fifth Amendment could not be interpreted to apply to aliens outside the territory of the United States. *Id.* at 785. In reaching this conclusion, the Court explicitly rejected the decision and reasoning of this court, which interpreted the term "person" to cover "any person who is deprived of his liberty by officials of the United States." *Eisentrager v. Forrestal*, 174 F.2d 961, 963 (D.C. Cir. 1949); *see also id*. at 965 (reasoning that "constitutional prohibitions … are not conditioned upon persons or territory").

The Supreme Court has repeatedly affirmed *Eisentrager*'s holding as to the Fifth Amendment and its Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well

established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States." (citing, *inter alia*, *Eisentrager*, 339 U.S. at 784)); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) ("Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." (citing *Eisentrager*, 339 U.S. at 770, 784)). Just this past Term, the Supreme Court noted that, subject to tightly limited exceptions, "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *USAID v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citing, *inter alia*, *Eisentrager*, 339 U.S. at 784–85); *see also DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (rejecting application of Due Process Clause to non-resident aliens as "contrary to more than a century of precedent"). Today, as when *Eisentrager* was decided, extraterritorial application of the Fifth Amendment would constitute a significant innovation at odds with longstanding precedent and the Constitution's separation of powers.

Relying on *Eisentrager* and its progeny, this court has consistently refused to extend extraterritorial application of the Due Process Clause. *See, e.g.*, *Kiyemba I*, 555 F.3d at 1026–27 ("[T]he due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." (citing, *inter alia*, *Eisentrager*, 339 U.S. at 783–84)); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." (citing, *inter alia*, *Eisentrager*, 339 U.S. at 771)); *32 Cnty. Sovereignty Comm. v. Dep't of*

*State*, 292 F.3d 797, 799 (D.C. Cir. 2002) ("[A] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." (quoting *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999))); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201–02 (D.C. Cir. 2001) (holding foreign organizations possess due process rights only if they develop "substantial connections" within the United States (quoting *Verdugo-Urquidez*, 494 U.S. at 271)); *Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002) (holding *Verdugo-Urquidez* and *Eisentrager* foreclosed due process claim for actions taken against alien abroad); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) (per curiam) ("The non-resident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States." (citing *Eisentrager*, 339 U.S. at 763)). With this framework in mind, we proceed to Al Hela's due process claims.

## B.

Al Hela argues the "substantive" component of the Due Process Clause bars indefinite detention without trial and that "his continued deprivation of liberty is excessive and is therefore punitive." Al Hela Unclass. Br. 62 (citing *United States v. Salerno*, 481 U.S. 739, 747–48 (1987)); Al Hela Unclass. Reply Br. 32, 35 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). We need not assess whether Al Hela has articulated a cognizable due process right because longstanding precedent forecloses any argument that "substantive" due process extends to Guantanamo Bay. *See Ali v. Trump*, 959 F.3d 364, 368–69 (D.C. Cir. 2020) (recognizing precedent forecloses the argument that substantive due process applies to Guantanamo Bay); *Qassim*, 927 F.3d at 528 (same); *Kiyemba*

*I*, 555 F.3d at 1026 ("The due process clause does not apply to aliens without property or presence in the sovereign territory of the United States."); *see also Eisentrager*, 339 U.S. at 785. Al Hela is an alien held outside the sovereign territory of the United States and therefore may not invoke the protections of the Due Process Clause to challenge his detention.[5]

The district court applied well established case law to reject Al Hela's due process arguments in the proceedings below. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 23–24. To distinguish these precedents on appeal, Al Hela presses several arguments that the Supreme Court's decision in *Boumediene* altered the longstanding rule barring extraterritorial application of the Due Process Clause.

First, Al Hela argues that *Boumediene*'s extension of the Suspension Clause to Guantanamo Bay abrogated *Eisentrager* because due process rights are implied by and inextricably intertwined with access to the habeas writ. On this view, habeas is a jurisdictional vehicle for presenting substantive claims rooted in the Fifth Amendment, and *Boumediene* could not have extended one without the other. Yet the Court in *Boumediene* clearly differentiated between the Suspension and Due Process Clauses and carefully limited its holding to the Suspension Clause by noting "our opinion does not address the content of the law that governs petitioners' detention" and "holds only that petitioners before us are entitled to seek the

---

[5] The U.S. Naval Station at Guantanamo Bay "is not part of the sovereign territory of the United States." *Kiyemba I*, 555 F.3d at 1026 n.9; *see also Boumediene*, 553 U.S. at 754. Our court has adhered to *Eisentrager*'s holding that the Fifth Amendment's Due Process Clause does not apply outside the territorial United States and therefore cannot be invoked by detainees at Guantanamo Bay, notwithstanding *Boumediene*'s holding that *de facto* sovereignty was relevant to the extraterritorial reach of the Suspension Clause.

writ." 553 U.S. at 795, 798. The Court also recognized the exceptional nature of its holding, recognizing "[i]t is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." *Id.* at 770.

In *Boumediene*, the Court established for the first time that the Suspension Clause guarantees Guantanamo detainees a "meaningful opportunity" to challenge their detention before a court with "the power to order the conditional release of an individual unlawfully detained." *Id.* at 779. Thus, a writ of habeas corpus provides a procedure—a "mechanism" or a "device"—that detainees may use to challenge their detention. *Id.* at 740, 743, 745, 765; *see also id.* at 798 ("[P]etitioners may invoke the fundamental procedural protections of habeas corpus."); *id.* at 802 (Roberts, C.J., dissenting) ("Habeas is most fundamentally a procedural right, a mechanism for contesting the legality of executive detention."); *Hawk v. Olson*, 326 U.S. 271, 274 (1945) ("[H]abeas corpus … is a proper procedure 'to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution.'" (citation omitted)). The writ also provides a judicial remedy, namely, the power to order "conditional release" when the Executive has exceeded its recognized detention authority, which here primarily rests on the AUMF and the 2012 NDAA. *Boumediene*, 553 U.S. at 779.

Beyond extending the writ's procedure and remedy, however, the Supreme Court explicitly "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (per curiam) (citing *Boumediene*, 553 U.S. at 798);

*accord Al Bahlul v. United States*, 840 F.3d 757, 796 (D.C. Cir. 2016) (en banc) (Millett, J., concurring); *Ali v. Rumsfeld*, 649 F.3d 762, 771 (D.C. Cir. 2011).

Second, Al Hela argues *Boumediene* established a universal three-factor test for the extraterritorial extension of constitutional rights, and that under this test we must extend the Due Process Clause of the Fifth Amendment to Guantanamo Bay. Since *Boumediene* derived the factors of its "functional test" from "pragmatic concerns" animating the *Eisentrager* decision, Al Hela maintains we should distinguish *Eisentrager* by concluding that these factors apply differently to Guantanamo Bay, Cuba, than they did to Landsberg Prison, Germany. This argument overshoots the mark. *Boumediene* did not create a new framework for lower courts to incorporate constitutional rights beyond our nation's borders. *See Rasul*, 563 F.3d at 529 (rejecting the argument that "*Boumediene* prescribes a multi-factor 'functional' test to determine whether aliens" can invoke constitutional rights).[6]

---

[6] In support of a wider application of the functional test in *Boumediene*, Al Hela points to separate opinions in *Al Bahlul* that stated the Ex Post Facto Clause would apply to Guantanamo Bay in light of *Boumediene*. *See Al Bahlul v. United States,* 767 F.3d 1, 63, 65 n.3 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment in part and dissenting in part); *see also id.* at 49 (Rogers, J., concurring in the judgment in part and dissenting). The en banc court, however, explicitly declined to decide the issue and instead relied on the government's concession that Al Bahlul was entitled to bring *ex post facto* claims. *See id.* at 18 ("[W]e will assume without deciding that the *Ex Post Facto* Clause applies at Guantanamo. In so doing, we are 'not to be understood as remotely intimating in any degree an opinion on the question.'" (citations omitted)). Moreover, in *Al Bahlul* we had no occasion to consider the extraterritoriality of the Due Process Clause, the issue presented for decision here.

To be sure, *Boumediene* applied a "functional test" to determine when and where the Suspension Clause follows United States forces abroad. *See* 553 U.S. at 766 ("[W]e conclude that at least three factors are relevant in determining the reach of the Suspension Clause."). But nothing in *Boumediene* suggests this functional test applies beyond the Suspension Clause. To the contrary, the Court emphasized the limited and exceptional nature of its holding, a conclusion bolstered by the fact that the Court has never applied *Boumediene*'s "functional test" to any other constitutional provision. Nor has this court applied *Boumediene* to constitutional provisions other than the Suspension Clause or extended the extraterritorial reach of the Suspension Clause beyond Guantanamo Bay. *See Al Maqaleh*, 605 F.3d at 99 (finding the Suspension Clause inapplicable to alien detainees at Bagram Airfield in Afghanistan); *see also Al Maqaleh v. Hagel*, 738 F.3d 312, 323–35 (D.C. Cir. 2013), *vacated in part sub nom. Al Najar v. Carter*, 575 U.S. 908 (2015) (reaffirming inapplicability of the Suspension Clause to Bagram Airfield despite new factual developments).[7]

---

[7] Other courts of appeals have recognized similar limits to *Boumediene*'s reach. *See, e.g.*, *Thuraissigiam v. DHS*, 917 F.3d 1097, 1111–12 (9th Cir. 2019), *rev'd on other grounds* 140 S. Ct. 1959 (2020) ("Although often conflated, the rights protected by the Suspension Clause are not identical to those under the Fifth Amendment's guarantee of due process. … *Boumediene* itself clearly recognized the distinction between the Fifth Amendment's due process rights and the Suspension Clause."); *Hernandez v. Mesa*, 885 F.3d 811, 817 (5th Cir. 2018) (en banc) ("[E]ven nine years later, no federal circuit court has extended the holding of *Boumediene* either substantively to other constitutional provisions or geographically to locales where the United States has neither *de facto* nor *de jure* control. Indeed, the courts have unanimously rejected such extensions."); *Ameur v. Gates*, 759 F.3d 317, 324 (4th Cir. 2014)

Al Hela effectively asks us to expand *Boumediene* and abrogate *Eisentrager* as well as longstanding circuit precedent. Yet *Boumediene* recognized only the availability of habeas relief to detainees in Guantanamo Bay. The "Privilege of the Writ of Habeas Corpus" is a "procedural protection" for challenging unlawful detention but does not include substantive rights. *Boumediene*, 553 U.S. at 798. The Court addressed only the availability of the writ and specifically declined to go further. Therefore, *Eisentrager* and the cases that follow remain good law, and we have no authority to undermine or to ignore controlling decisions of the Supreme Court. Rather, lower courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)).

Our concurring colleague contends that applying these well established precedents barring extraterritorial application of "substantive" due process is an "*additional* ground" that we need not reach. Concurring Op. 3 (Griffith, J.). Yet it is unclear how applying binding precedent to answer a threshold question is a "new ground" when compared with the concurrence's resolution of difficult constitutional questions "on the merits." *Id.* at 2–8. The concurrence goes astray by interpreting *Qassim* and *Ali* as implicitly extending "substantive" due process to detainees at Guantanamo Bay. In *Qassim*, we explicitly acknowledged that prior decisions of our court barred application of "substantive" due process and questioned only

---

("Boumediene relied on law exclusive to habeas corpus and therefore should be applied only to the habeas-corpus context in which it arose."); *Igartua v. United States*, 626 F.3d 592, 600 (1st Cir. 2010) ("[T]he *Boumediene* court was concerned only with the Suspension Clause, and not with … any other constitutional text.").

"what constitutional *procedural* protections apply to the litigation of a detainee's habeas corpus petition in the first instance." 927 F.3d at 524 (emphasis added); *see also id.* at 530 (collecting cases for the proposition that "no subsequent decision of this court has read *Kiyemba* [*I*] as walling off Guantanamo Bay detainees from all constitutional procedural protections"). Likewise, in *Ali*, we rejected the argument that "substantive" due process applies to Guantanamo Bay, which we concluded would run "crosswise with this court's decision in *Kiyemba* [*I*]." 959 F.3d at 369. The concurrence extends our court's limited reservation of whether "procedural" due process applies at Guantanamo Bay to now reserve the question of whether "substantive" due process may apply at Guantanamo Bay. With the rallying cry of judicial restraint, the concurrence would thus open a gaping hole in the foundation of our longstanding due process jurisprudence.

The Supreme Court has not revisited the extraterritorial application of the Due Process Clause. Accordingly, we have taken the Supreme Court at its word that *Boumediene* concerned only the availability of the writ of habeas corpus. *See, e.g.*, *Ali*, 649 F.3d at 771 (noting in a qualified immunity context that the applicability of due process rights to Guantanamo is not clearly established); *Al Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011) (noting on habeas review that our court has rejected the application of due process rights to Guantanamo). While we must enforce constitutional limits on the Executive Branch in this context as in any other, it would be well beyond our authority to extend or to create new constitutional limits on the conduct of wartime detention by the political branches.

C.

Al Hela further argues that three of the district court's discovery and evidentiary rulings—the same three he challenges under the Suspension Clause—violated "procedural" due process. Al Hela seeks to expand on a suggestion in *Qassim v. Trump* that precedent might not explicitly foreclose the extraterritorial application of "procedural" due process requirements. *See* 927 F.3d at 530. In *Qassim*, we noted for the first time that whether the constitutional procedural protections applicable to habeas review derive from "the Fifth Amendment's Due Process Clause, the Suspension Clause, both, or elsewhere" is an "open and unresolved" question. *Id.* Yet we declined to resolve the issue in that instance because the "parties never tested the disclosure procedures in the case management and protective orders." *Id.* at 531. Further, the government had conceded on appeal that "some of the sought-after information may properly be disclosed" under the case management order and existing law. *Id.* at 525. With the benefit of full briefing and "specific discovery requests [that were] made and ruled upon," *id.* at 531, this case squarely presents the question whether procedural due process applies extraterritorially.

1.

Before reaching that threshold question, however, we must address the government's contention that we need not decide whether procedural due process applies extraterritorially because the district court satisfied all applicable procedural due process requirements. Courts should not decide constitutional questions when alternative grounds for decision are fairly available. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching

constitutional questions in advance of the necessity of deciding them."); *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) ("[W]e must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution.'" (citation omitted)). This principle applies with particular force in the context of foreign affairs and national security, which are entrusted to the political branches and should be approached by the judiciary with great care. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2419–20 (2018) ("'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of … national security is highly constrained." (quoting *Diaz*, 426 U.S. at 81–82)). Our court has taken this approach in several other cases by assuming a threshold constitutional point and then determining the case on other grounds. *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1039 (D.C. Cir. 2014); *Al Madhwani*, 642 F.3d at 1077; *Rasul*, 563 F.3d at 529. *But see Thuraissigiam*, 140 S. Ct. at 1981–83 (rejecting due process claims by deciding the threshold question whether non-resident aliens are entitled to constitutional due process protections).

In this case, however, we would be forced to decide difficult constitutional questions regardless of which path we take. Even if we were to assume without deciding that "procedural" due process could be separated from "substantive" due process and applied extraterritorially, the procedural standards are not clearly settled in this specific context. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). When analyzing due process claims, courts generally consider "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental

interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In the context of wartime detention, the Court has stated that a citizen detained within the territorial United States "must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 533 (plurality opinion).

No previous decision of this court or the Supreme Court has set forth the particular procedural due process standards that would apply to aliens detained abroad. This is likely because, prior to *Qassim*, this court never suggested a separation between the extraterritorial application of "procedural" and "substantive" due process. Instead, our court and the district courts have developed procedures for meaningful habeas review under the Suspension Clause in the wake of *Boumediene*. Here, while readily resolved under our habeas standards, *see supra* Part III, at least two of Al Hela's procedural due process claims raise questions not squarely addressed by due process precedents and would require that we articulate and apply distinct constitutional standards. Assuming without deciding the extraterritorial reach of "procedural" due process therefore does not allow us to avoid deciding Al Hela's challenges on constitutional grounds.

First, Al Hela claims the district court violated due process by crediting anonymous, multi-layered hearsay in the intelligence reports offered by the government. The district court deemed the evidence reliable after ex parte, in camera consideration of underlying sources and materials. *Al Hela*, No. 05-cv-1048, unclass. slip op. at 25–26. According to Al Hela, this decision violated the constitutional bar on unreliable evidence, *see* Al Hela Unclass. Br. 72 (citing *Michigan v. Bryant*, 562 U.S. 344, 370 n.13 (2011)), as well as the due

process right to confront witnesses and evidence against him when liberty is at stake, *see id.* at 72–73 (citing *Gardner v. Florida*, 430 U.S. 349, 360–62 (1977), *Morrissey*, 408 U.S. at 485–86, and *Specht v. Patterson*, 386 U.S. 605, 608–09 (1967)). The government argues *Hamdi* held that hearsay evidence is consistent with due process in the context of wartime detention. But *Hamdi*'s observation that hearsay "*may* need to be accepted as the most reliable available evidence from the Government" falls short of conclusively allowing the multiple layers of anonymous hearsay relied upon in this case. 542 U.S. at 533–34 (plurality opinion) (emphasis added). Given the "flexible" and "particular" nature of the procedural due process inquiry, *Morrissey*, 408 U.S. at 481, we would need to identify what private interests Al Hela may assert as an alien detained abroad and the competing interests of the government with respect to national security. We cannot simply assume the same interests and balance identified in *Hamdi*, which involved a citizen detained on United States soil, would apply to noncitizens detained outside the territory of the United States.

Second, Al Hela argues the district court violated due process by denying him personal access to the charges and evidence against him. Al Hela's counsel received access to the government's factual return and supporting exhibits under a protective order that barred discussing the information with his client. Al Hela received little more than a short summary of the classified material. *Al Hela*, 2016 WL 2771804, at \*1. Al Hela argues that this limited access deprived him of the ability to rebut the government's case with relevant evidence and hamstrung his counsel's ability to mount a defense. Al Hela Unclass. Br. 68 (claiming the Due Process Clause guarantees Guantanamo detainees a "reasonable opportunity to know the claims of the opposing party and to meet them" (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938))). While we

have conclusively rejected these claims and upheld similar case management orders under the Suspension Clause, existing law does not conclusively settle the question whether procedural due process requires that Al Hela receive additional access to the evidence against him under these circumstances.

In order to assess Al Hela's challenges on the merits, we would need to create a distinct framework for procedural due process in the Guantanamo detention context. We cannot simply assume extraterritorial application here for the sake of efficiency. Evaluating Al Hela's claims would require the court to assess constitutional questions including the scope of Al Hela's cognizable private interests, the government's interests in national security and protecting classified information, and the proper balance of those interests in the context of wartime detention.

Our concurring colleague demonstrates the hazards of assuming the applicability of constitutional due process rights. Sidestepping the question whether "procedural" due process applies extraterritorially to aliens, he would create out of whole cloth a new standard defining what process is due to detainees at Guantanamo Bay. Without explanation, he asserts that these due process protections are coextensive with the process required by the Suspension Clause and that "[a]nalyzing Al Hela's three specific claims under the Due Process Clause adds nothing" to our analysis under the Suspension Clause. Concurring Op. 7 (Griffith, J.). Yet we have never intimated that these constitutional standards require the same protections, either as a general matter or as to the specific confrontation and evidentiary access claims Al Hela raised below. *See, e.g.*, *Boumediene*, 553 U.S. at 785 (emphasizing "the Suspension Clause remains applicable and the writ relevant" even when procedures satisfy due process standards). The concurrence would assume without deciding that "procedural" due process

applies to detainees at Guantanamo and then *also decide* the particular content of the process owed. To declare that the procedural requirements of the Due Process Clause are applicable and equivalent to those of the Suspension Clause is no act of judicial humility. It is a momentous constitutional holding.[8]

After *Boumediene*, the lower courts took up the Supreme Court's command to balance the right of detainees to "meaningful review" of their habeas claims with the government's "legitimate interest in protecting sources and methods of intelligence gathering," all while according "proper deference … to the political branches." *Boumediene*, 553 U.S. at 796; *see Al Bihani*, 590 F.3d at 870 ("The Supreme Court has provided scant guidance on these questions, consciously leaving the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion."). More than a decade later, this court and the district court have developed a substantial body of law *under the Suspension Clause* to govern habeas review for Guantanamo detainees. The Supreme Court has declined further review.[9] Assuming the extraterritorial application of "procedural" due process hardly puts us on a narrow path, because such an

---

[8] The concurrence's equation of two different constitutional provisions runs against the reasoning of *Qassim* and *Ali*. In both cases, our court left open the question whether "procedural" due process protections extend to Guantanamo detainees. Such a reservation would have been irrelevant if the standards for "procedural" due process have always been the same as those under the Suspension Clause. The concurrence's conclusory assertions simply have no basis in law.

[9] Congress has similarly left the field. Congress last articulated standards for the review of detainee claims when it reaffirmed the President's AUMF detention authority in the 2012 NDAA.

assumption would require us to create a standard specifically for aliens detained abroad, forcing this court into unchartered territory.[10]

2.

Rather than embark on a journey to discover new judicial standards, we instead address the threshold question whether the "procedural" component of the Due Process Clause applies to aliens detained abroad—a question readily answered by existing precedent.

Al Hela maintains that *Qassim* interpreted *Boumediene* to establish a distinction between "procedural" and "substantive" due process such that procedural due process rights apply to detainees at Guantanamo Bay. He argues that we must now apply procedural due process rules developed in other contexts to his habeas petition. Yet *Qassim* ushered in no such constitutional revolution. In that case, we repeatedly noted that deciding procedural due process questions would be "premature," 927 F.3d at 530, and remanded for the district court to consider "Qassim's claimed constitutional right to access the classified information in the government's hands and the constitutional source (if any) of such a right," *id.* at 525. We explicitly declined to determine whether Qassim had procedural due process rights and, if so, the content and application of such rights. We held the district court applied "an erroneous legal framework" when it assumed, without further analysis of the question, that *Kiyemba I*'s broad

---

[10] Nothing in this opinion should be construed to affirmatively suggest that Al Hela's procedural due process claims would be successful if he were entitled to the Fifth Amendment's protections. We merely note that the questions presented would be ones of first impression and that existing precedent would not directly resolve his constitutional challenges.

statements of law must be read as "a categorial bar on constitutional procedural protections in habeas litigation for foreign detainees at Guantanamo Bay." *Id.* at 527–28.

*Qassim* did not, however, identify or create a new legal framework. Rather, we remanded for the district court to consider in the first instance "whether and how the Due Process Clause applies," *id.* at 528, and noted "[c]ircuit precedent leaves open and unresolved the question of what constitutional procedural protections apply to the adjudication of detainee habeas corpus petitions," *id.* at 530; *accord Ali*, 959 F.3d at 368 ("Circuit precedent has not yet comprehensively resolved which 'constitutional procedural protections apply' … and whether those 'rights are housed' in the Due Process Clause, the Suspension Clause, or both." (quoting *Qassim*, 927 F.3d at 530)). *Qassim*'s suggestion that procedural due process might apply to detainees at Guantanamo Bay was, as the panel emphasized, based on an incomplete record and briefing. 927 F.3d at 531–32.

The question whether procedural due process applies extraterritorially is not premature here because Al Hela raised it below, both before and during his merits hearing.[11]

---

[11] Al Hela sought access to the government's ex parte filings on the grounds that withholding the information constituted a "violation of due process." *See* Al Hela Unclass. Reply Br. 33–34 (citing Dkts. 294, 299); Order of Nov. 19, 2014, *Al Hela*, No. 05-cv-1048. He also sought personal access to classified information in the government's factual return. *Al Hela*, No. 05-cv-1048, 2016 WL 2771804, at *1. Finally, he argued that his indefinite detention violated "substantive" due process and that the hearsay evidence against him was insufficiently reliable to support detention. *See Al Hela*, No. 05-cv-1048, unclass. slip op. at 23–28. Al Hela raised each of these objections during or prior to a full hearing on the merits of whether the government's evidence supported his detention. This

Moreover, the issue is a pure question of law on which we have detailed briefing and the benefit of both open and closed oral argument to discuss the implications of the unclassified and classified records in this case. Unlike in *Qassim*, remand to the district court is unnecessary. With the constitutional question squarely before us, we conclude that the protections of the Due Process Clause, whether labeled "substantive" or "procedural," do not extend to aliens without property or presence in the sovereign territory of the United States.

Resolving the constitutional question raised by *Qassim* requires a more exhaustive consideration of Supreme Court and circuit precedent.[12] We begin with *Eisentrager*, in which the Supreme Court focused on the meaning of the term "person" in the Fifth Amendment, rejecting our court's conclusion that the term encompasses aliens abroad. *See Eisentrager*, 339 U.S. at 781–84, *rev'g Eisentrager*, 174 F.2d at 963. The Supreme Court's conclusion remains true no matter what kind of due process is at issue.

---

distinguishes the instant case from *Ali*, for example, which did not involve a hearing on the merits of the evidence supporting detention but instead considered the petitioner's argument that the government owed him additional process to justify the *duration* of detention. 959 F.3d at 371–72. Al Hela's specific challenges to evidentiary and discovery rulings by the district court provide an adequate record to resolve whether "procedural" due process protections apply extraterritorially.

[12] *Qassim* held only that the district court resolved a habeas petition under an "erroneous legal framework" when it misapplied our decision in *Kiyemba I* to foreclose "procedural" due process claims. 927 F.3d at 527. Thus, *Qassim* did not examine other circuit precedents or the Supreme Court's holding in *Eisentrager*, except to note that *Kiyemba I* did not directly address "procedural" due process. *Id.* at 529 n.5.

Indeed, *Eisentrager* made no distinction between "substantive" and "procedural" due process, nor between the Due Process Clause and other provisions of the Fifth Amendment. Rather in *Eisentrager*, the Court built on earlier precedents that declined to review the adequacy of procedures granted to enemy combatants and limited judicial inquiry to whether the government acted within its authority. *See, e.g.*, *In re Yamashita*, 327 U.S. 1, 23 (1946); *Ex parte Quirin*, 317 U.S. 1, 25 (1942). The Supreme Court's reasoning barring extraterritorial application of the Due Process Clause applied without distinction, and therefore with equal force, to "substantive" and "procedural" claims.

The Court's more recent decisions have relied upon *Eisentrager* without distinguishing between substance and procedure. In *Zadvydas*, for example, the Court considered both "substantive" and "procedural" due process issues related to detention of aliens within the United States and cited *Eisentrager* as foreclosing the extraterritorial application of the Due Process Clause as a whole. *See* 533 U.S. at 690–94. Likewise in *Verdugo-Urquidez*, the Court noted *Eisentrager*'s "rejection of extraterritorial application of the Fifth Amendment was emphatic" and understood its holding to cover the "Fifth Amendment rights" of aliens outside the United States without recognizing any distinction between the "substantive" and "procedural" components of those rights. 494 U.S. at 269. And recently the Court relied on *Eisentrager* and its progeny to declare without any distinction between "substantive" and "procedural" rights that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *All. for Open Soc'y*, 140 S. Ct. at 2086 (citing, *inter alia*, *Eisentrager*, 339 U.S. at 784). Were this not the rule, "actions by American military, intelligence, and law enforcement personnel against foreign organizations or foreign citizens in foreign countries would be constrained by the

foreign citizens' purported rights." *Id.* (citing, *inter alia*, *Eisentrager*, 339 U.S. at 784–85).

Similarly, this circuit has consistently cited *Eisentrager* for the proposition that procedural due process protections are unavailable to aliens and organizations without property or presence in the United States. For example, we rejected a foreign entity's challenge to the Secretary of State's terrorism designation because the foreign entity was not entitled to procedural due process protections. *See 32 Cnty. Sovereignty Comm.*, 292 F.3d at 799; *see also People's Mojahedin*, 182 F.3d at 22. After *Boumediene*, our court continued to understand the *Eisentrager* rule as foreclosing extraterritorial application of the Due Process Clause in its entirety. In the *Rasul* litigation, we categorically rejected procedural due process claims brought by Guantanamo detainees in a decision later vacated in light of *Boumediene*. *See Rasul v. Myers*, 512 F.3d 644, 663–65 (D.C. Cir.), *vacated by* 555 U.S. 1083 (2008). On remand, we reaffirmed our pre-*Boumediene* rejection of the claims on the same ground, concluding that the Court had done nothing to disrupt its holding in *Eisentrager* that the Fifth Amendment and its Due Process Clause are inapplicable to aliens abroad. *See* 563 F.3d at 529, *cert. denied* 558 U.S. 1091 (2009). Likewise, in *Al Madhwani*, we considered a procedural due process challenge to improper reliance on evidence outside the record. We noted "[t]his Court has ... stated that the detainees [at Guantanamo Bay] possess no constitutional due process rights" before resolving the case on the narrower ground that the district court had not in fact relied on the evidence. 642 F.3d at 1077 (quoting *Kiyemba v. Obama*, 561 F.3d 509, 518 n.4 (D.C. Cir. 2009) ("*Kiyemba II*") (Kavanaugh, J., concurring)). In *Qassim*, we noted that our decision in *Kiyemba I* applied *Eisentrager* to address a remedial question pertaining to petitioners' release. 927 F.3d at 529 & n.5 (quoting *Kiyemba I*, 555 F.3d at 1026–27). That

observation, however, did not unravel our longstanding precedent in this area. After *Boumediene*, our court's detention decisions have not distinguished between the extraterritorial reach of "substantive" and "procedural" due process.

Thus, except for the question raised but not answered by *Qassim*, neither the Supreme Court nor this court have recognized or suggested any grounds for a legal distinction between the extraterritorial application of "substantive" and "procedural" due process rights. Rather, the Supreme Court and this circuit have asserted that the Fifth Amendment and its Due Process Clause more specifically do not extend to aliens without property or presence in the United States.

In the course of deciding dozens of Guantanamo detainee cases, we have on occasion assumed without deciding that certain due process rights might apply to Guantanamo. *See Qassim*, 927 F.3d at 530. In those cases, we chose to decide the claims on grounds other than the threshold question of extraterritoriality. *See Aamer*, 742 F.3d at 1039–41 (assuming without deciding that the right to be free from unwanted medical treatment applies but denying the claim as foreclosed by precedent); *Al Madhwani*, 642 F.3d at 1077 (finding that even if procedural due process applied, any error would be harmless beyond a reasonable doubt because it did not impact the district court's decision); *Rasul*, 563 F.3d at 529–30 (rejecting due process and Eighth Amendment claims on qualified immunity grounds); *Kiyemba II*, 561 F.3d at 514 & n.4 (rejecting due process challenge to Executive transfer determination as clearly foreclosed by precedent). Those cases, which explicitly declined to decide the issue, may not now be used to support the extraterritorial extension of procedural due process rights. The Supreme Court has consistently barred extraterritorial application of the Due Process Clause. Repeated

reservation of a legal question cannot later settle that question and unravel binding Supreme Court precedent.

Al Hela places great weight on language in *Qassim* noting that *Boumediene* "pointed to" both the Due Process and Suspension Clauses when discussing the scope of habeas review. 927 F.3d at 529. Nonetheless, the Supreme Court never suggested the Due Process Clause applies to Guantanamo detainees. *Boumediene*, 553 U.S. at 785. Instead, the Court focused on determining the "necessary scope of habeas review," which it noted would "in part depend[] upon the rigor of any earlier proceedings." *Id.* at 781. Thus, the Court did not incorporate or develop any procedural due process standards or elaborate on the applicability or scope of such standards, but instead focused its analysis entirely on the extent of habeas review. *Boumediene* explained that the Suspension Clause imposes distinct requirements for habeas review in the context of wartime detention and tasked the lower courts with developing standards for that review. *Id.* at 798. Procedures developed by this court and the district court after *Boumediene* have provided for "meaningful review" of the lawfulness of detention at Guantanamo Bay. The Supreme Court has repeatedly denied certiorari in cases challenging these procedures. *See, e.g.*, *Hussain v. Obama*, 572 U.S. 1079 (2014); *Al Madhwani v. Obama*, 567 U.S. 907 (2012); *Kiyemba v. Obama*, 563 U.S. 954 (2011); *Al Bihani v. Obama*, 563 U.S. 929 (2011); *Rasul v. Myers*, 558 U.S. 1091 (2009). Determining that procedural due process rights apply extraterritorially would require us to read *Boumediene* to effectuate an implied repeal of *Eisentrager* and its progeny. In the absence of direction from the Supreme Court, we decline to reverse binding precedent and extend new constitutional protections to alien detainees at Guantanamo Bay.

At bottom, Al Hela presses us to recognize and create a new body of constitutional law for alien detainees held outside the sovereign territory of the United States. Yet judicial innovation in this sphere would have far reaching consequences for the government's detention and national security policies in this and future wars. As the Supreme Court has explained, we must accord "proper deference … to the political branches" when assessing "detention to prevent acts of terrorism." *Boumediene*, 553 U.S. at 796. Our court has carefully followed this command by declining to craft additional judicial standards to govern the War on Terror. *See, e.g.*, *Al Maqaleh*, 738 F.3d at 335 ("[R]espect for the separation of powers impels us to stay our hand."). Instead, for over a decade we have faithfully applied the Supreme Court's directive in *Boumediene* by developing a distinct body of law that guarantees a "meaningful opportunity" for habeas review while respecting the national security prerogatives of the political branches. The Executive Branch has relied upon these procedural standards and neither Congress nor the Supreme Court have suggested we should embellish further constitutional limits on the detention of terrorists abroad.

Under longstanding precedents of this court and the Supreme Court, the Due Process Clause cannot be invoked by Guantanamo detainees, whether those due process rights are labeled "substantive" or "procedural." The Suspension Clause provides all the process to which Al Hela is entitled. Thus, we reject Al Hela's due process claims on the threshold determination that, as an alien detained outside the sovereign territory of the United States, he may not invoke the protection of the Due Process Clause.

47

*   *   *

Al Hela's detention falls within the scope of the President's authority, and the district court's habeas procedure comported with applicable constitutional requirements. The order denying Al Hela's petition for a writ of habeas corpus is affirmed.

*So ordered*.

GRIFFITH, *Circuit Judge*, concurring in part and concurring in the judgment: "[T]he cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. Drug Enf't Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). With that principle in mind, I concur only in Parts I, II, and III of the court's opinion. Because we can resolve this case without deciding whether Guantanamo detainees may ever assert rights under the Due Process Clause, I do not join Part IV.

Al Hela brings two sets of challenges under the Due Process Clause—a substantive challenge to the length of his detention and procedural challenges to the district court's evidentiary rulings. Like my colleagues, I would reject those challenges. But unlike my colleagues, I would do so without taking on the broader question of whether the Due Process Clause applies at Guantanamo. That is a question with immense sweep that our court has repeatedly reserved for a case in which its answer matters. It does not here. Al Hela's challenge to the length of his detention fails under established case law, regardless of whether he may bring that challenge under the Due Process Clause in the first place. And his three procedural challenges fail under our precedent developed under the Suspension Clause in the wake of *Boumediene v. Bush*, 553 U.S. 723 (2008). That precedent provides Al Hela as much process as he would have been due under the Due Process Clause with respect to his particular claims.

"[E]ven when a constitutional question must be joined, courts must choose the narrowest constitutional path to decision." *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 896 F.3d 539, 544 (D.C. Cir. 2018). I cannot join the majority's decision to cut a wider path than necessary.

2

I

Al Hela first argues that the length of his detention violates his substantive due process rights. Our circuit has frequently assumed without deciding that Guantanamo detainees may assert due process rights before rejecting their claims on the merits. *See Ali v. Trump*, 959 F.3d 364, 369-73 (D.C. Cir. 2020) (assuming that a detainee may bring due process challenges to the length of his detention, the use of hearsay evidence, and the standard of proof governing his detention and rejecting those challenges on the merits); *Aamer v. Obama*, 742 F.3d 1023, 1038-42 (D.C. Cir. 2014) (assuming that the substantive due process "right to be free from unwanted medical treatment" applies at Guantanamo and rejecting detainees' claims on the merits); *Kiyemba v. Obama*, 561 F.3d 509, 514 n.4 (D.C. Cir. 2009) (assuming that detainees have the same due process rights as U.S. citizens with respect to their transfer to foreign custody and rejecting their claims on the merits). Following that path here, we need not determine whether Al Hela can invoke the protection of the Due Process Clause because *Ali* forecloses his challenge to the length of his detention on the merits. *See* 959 F.3d at 369-71. There, we rejected a nearly identical claim, holding that "under binding circuit precedent the Due Process Clause's substantive protections . . . offer [Ali] no help." *Id.* at 369.

Like Al Hela, Ali had argued that his detention had become punitive over time and that its seemingly perpetual duration violated the Due Process Clause. We disagreed. Assuming Ali could bring this challenge, we held that "the fact that hostilities have endured for a long time, without more, does not render the government's continued detention" unlawful. *Id.* at 371. Given the ongoing conflict with Al Qaeda, "detention still serves the established law-of-war purpose of preventing captured individuals from returning to the field of battle." *Id.*

at 370 (internal quotation marks and brackets omitted). Al Hela contends that his detention no longer serves this preventive purpose and has instead become unlawfully punitive. But just as with Ali, the Executive Branch has reviewed Al Hela's detention no less than eight times, each time reaffirming that he represents "a continuing significant threat to the security of the United States." Gov't Unclass. Br. 55; *see also Ali*, 959 F.3d at 370 & n.3. Because the Government has repeatedly found that Al Hela's detention continues to serve this preventive purpose, his challenge to the length of his confinement fails under established case law.

That is all the majority needed to say. Instead, the majority goes further and finds Al Hela's claim deficient on the *additional* ground that he lacks any rights under the Due Process Clause. The majority reads our precedent as "foreclos[ing] any argument that 'substantive' due process extends to Guantanamo Bay." Maj. Op. at 26. But we have never made such a far-reaching statement about the Clause's extraterritorial application. If we had, we would not have repeatedly assumed without deciding that detainees could bring substantive due process claims. *See Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019) (collecting cases). Likewise, we would not have evaluated Ali's substantive challenge to the length of his detention on the merits; we would have dismissed it on the ground that he could not bring it at all. *See Ali*, 959 F.3d at 369-71. Partly in light of those repeated reservations, we recently rejected the argument that our precedent imposed a categorial bar on the application of the Due Process Clause at Guantanamo, explaining that our decision in *Kiyemba v. Obama* "ruled *only* that the Due Process Clause does not invest detainees who have already been granted habeas corpus with a substantive due process right to be released into the United States." *See Qassim*, 927 F.3d at 524 (emphasis added) (citing *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009), *vacated*,

559 U.S. 131 (2010), *judgment reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010)); *see also Ali*, 959 F.3d at 369 (rejecting only the argument that "the substantive protections of the Due Process Clause apply *across the board*" because *Kiyemba* bars detainees from claiming a "right to release into the United States") (emphasis added)).

Because we can resolve Al Hela's challenge to the length of his detention on the same merits grounds as *Ali*, we need not—and should not—add a new ground, especially one of the vast scope endorsed by the majority. And if the majority feels that it must break new ground, it should at least do so forthrightly, acknowledging that it is taking a significant step that our court has thus far declined to take.

II

Al Hela next argues that three of the district court's evidentiary rulings violated his procedural rights under the Due Process Clause and his right to a meaningful hearing under the Suspension Clause. Again, we do not need to decide whether the Due Process Clause applies at Guantanamo to resolve these claims. "More than a decade of case law has defined the procedures required to guarantee detainees the meaningful opportunity for habeas review required by the Suspension Clause," and the district court's rulings carefully followed that precedent to ensure Al Hela had a meaningful hearing. Maj. Op. at 18-22. Analyzing the district court's rulings under the Due Process Clause yields the same result.

In each of the three areas of process that Al Hela challenges (hearsay evidence, *ex parte* evidence, and lack of personal access to the evidence), we have already afforded detainees as much protection under the Suspension Clause as we have afforded non-detainees in similar settings under the

Due Process Clause. Because Al Hela's specific claims fail under both clauses, it makes no difference whether detainees like Al Hela may ever bring due process claims. The majority thus had no occasion to reach out and bar all such claims today.

To start, our Suspension Clause cases have long held that hearsay evidence is admissible in habeas proceedings at Guantanamo provided that it is reliable. *See, e.g.*, *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010); *Al-Bihani v. Obama*, 590 F.3d 866, 879-880 (D.C. Cir. 2010). Citing that precedent in *Ali*, we rejected a detainee's challenge to the "use of hearsay evidence during habeas corpus and other detention proceedings" under the Due Process Clause. *See Ali*, 959 F.3d at 372. That holding makes good sense; the Supreme Court has suggested that the Due Process Clause would permit the Government to rely on hearsay evidence to justify the detention of even American citizens on sovereign U.S. soil during wartime. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-34 (2004). The protections we have developed for Guantanamo detainees under the Suspension Clause provide no less, and under those precedents, the district court found that the hearsay evidence used against Al Hela was reliable.

Likewise, our Suspension Clause precedent supports the submission of *ex parte* evidence provided that the government offers the detainee's counsel "reasonable alternatives" that provide a "meaningful opportunity" for review. *Khan v. Obama*, 655 F.3d 20, 31 (D.C. Cir. 2011) (internal quotation marks omitted). In applying that precedent, the district court carefully "reviewed the [Government's] proposed redactions, approving some and requesting clarifications or justification of others," and rejected at least one proposed substitute "on the grounds that it did not adequately represent the exculpatory information in the exhibit." *Al Hela v. Trump*, No. 05-cv-01048 (D.D.C. Jan. 13, 2017), Dkt. No. 413-1, at 1.

Once again, the Due Process Clause would grant Al Hela nothing more. The Due Process Clause allows "classified information to be presented *in camera* and *ex parte* to the court" in cases challenging a party's designation as a "foreign terrorist organization" or "drug kingpin." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001); *see also Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1241-43 (D.C. Cir. 2003). Further, we have held that "the United States enjoys a privilege in classified information affecting national security so strong that even a criminal defendant to whose defense such information is relevant cannot pierce that privilege absent a specific showing of materiality." *Nat'l Council*, 251 F.3d at 207; *see also United States v. Yunis*, 867 F.2d 617, 623-24 (D.C. Cir. 1989). Even then, the court must not disclose the material unless it "determine[s] that alternatives to disclosure would not effectively substitute for unredacted access." *Al Odah v. United States*, 559 F.3d 539, 547 (D.C. Cir. 2009). So again, Al Hela's challenge fails under established case law.

Finally, our precedent under the Suspension Clause encourages the "search for reasonable alternatives" to disclosure of classified information, including the use of summaries that "accurately represent[] the information contained in [classified] reports." *Khan*, 655 F.3d at 31. We have never held that a detainee must have unrestricted personal access to the evidence against him to guarantee a meaningful hearing under *Boumediene*. Similarly, we have never said that the Due Process Clause requires such unrestricted personal access in foreign-terrorist-organization and drug-kingpin designation cases. And other circuits have approved limitations on disclosure in criminal cases to security-cleared counsel where the defendant had access to the "relevant facts set forth

in [the undisclosed] material." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 127 (2d Cir. 2008). Here, the Government provided Al Hela with an unclassified summary of many of the facts and allegations against him and offered "specific and persuasive reasons to believe that further disclosure . . . would risk revealing U.S. intelligence sources and methods." *Al Hela v. Trump*, No. 05-cv-01048 (D.D.C. May 13, 2016), Dkt. No. 404, at 5. Whether assessed under the Suspension Clause or the Due Process Clause, the district court's rulings provided Al Hela a meaningful opportunity for review of his detention.

That the Due Process Clause and the Suspension Clause provide similar protections to Al Hela should come as no surprise. We have developed an extensive body of case law under the Suspension Clause that guarantees detainees "a meaningful opportunity to demonstrate that [they are] being held" unlawfully, while still respecting the government's "legitimate interest in protecting sources and methods of intelligence gathering." *Boumediene*, 553 U.S. at 779, 796. The Due Process Clause requires us to conduct a similar balancing. Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), we weigh the detainee's interest in the "opportunity to be heard at a meaningful time and in a meaningful manner," *Nat'l Council*, 251 F.3d at 208 (internal quotation marks omitted), against the government's interest in protecting national security, *see Hamdi*, 542 U.S. at 533-35. Analyzing Al Hela's three specific claims under the Due Process Clause adds nothing to the analysis we have already conducted under *Boumediene*, as a review of our due process case law demonstrates. *Cf. Ali*, 959 F.3d at 372 (finding several procedural due process claims "foreclose[d]" by our Suspension Clause precedent). Although it is possible that other procedural claims may fare better under the Due Process Clause than under the Suspension Clause, we need not address claims not before us today. Whether analyzed

under the Suspension Clause or the Due Process Clause, Al Hela's three specific objections fail. That is all the court needed to say to resolve this case, and I would not say any more.

\* \* \*

The majority argues that its decision is an exercise in judicial restraint. Maj. Op. at 33-39. I respectfully disagree. It is considerably more restrained to apply our established precedents to Al Hela's narrow claims than it is to make sweeping proclamations about the Constitution's application at Guantanamo. Questions about the application of the Constitution to Guantanamo have long divided judges on this circuit. *Compare Al Bahlul v. United States*, 767 F.3d 1, 18 n.9 (D.C. Cir. 2014) (en banc) (noting that five judges would hold that the Ex Post Facto Clause applied at Guantanamo under *Boumediene*), *and Ali*, 959 F.3d at 369 ("*Boumediene* and *Qassim* teach that the determination of what constitutional procedural protections govern the adjudication of habeas corpus petitions from Guantanamo detainees should be analyzed on an issue-by-issue basis, applying *Boumediene*'s functional approach."), *with Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (per curiam) (suggesting that *Boumediene* is limited to the Suspension Clause). The day may yet come when we need to resolve the matter because the case before us demands it. But this is not that case. Because the Due Process Clause would not provide Al Hela more procedural protections than he received, the court today had no need to reach the question of the Clause's application at Guantanamo.

RANDOLPH, *Senior Circuit Judge*, concurring: I agree with the court's decision not only for the reasons expressed in its opinion, but also for the additional reasons stated in my opinion concurring in the judgment in *Ali v. Trump,* 959 F.3d 364, 373 (D.C. Cir. 2020).